No. 07-206C
(Judge Allegra)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Lublin Corp., t/a Century 21 Advantage Gold,

Plaintiff,
v.

The United States,

Defendant.

# DEFENDANT'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

MARK A. MELNICK
Assistant Director

MATTHEW H. SOLOMSON
Trial Attorney, Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3274
Fax: (202) 514-8624

June 3, 2008

Attorneys for Defendant

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY . . . 1

I. Lublin's Alleged Contract In This Case Is A "Procurement Contract" Under Both The Federal Grant and Cooperative Agreement Act of 1977 And The Office of Federal Procurement Policy Act And Thus Is Covered By The CDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Lublin's Allegation Of An Express Oral Contract Is Precluded By 31 U.S.C. § 1501(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

## CASES

Am. Gen. Leasing, Inc. v. United States,
587 F.2d 54 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Blanco-Mora Enters., Inc.,
94-3 BCA 26974, 1994 WL 248163 (HUDBCA June 10, 1994) . . . . . . . . . 3

J.W. Burress, Inc. v. JLG Indus., Inc.,
491 F. Supp. 15 (W.D. Va. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Chem Serv. v. Environmental Monitoring Sys. Laboratory-Cincinnati,
12 F.3d 1256 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

Clark v. United States,
95 U.S. 539 (1877) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Dettmers v. Commissioner,
430 F.2d 1019 (6th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Essex Electro Engineers, Inc. v. United States,
2008 WL 782740 (Fed. Cl. Feb. 20, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 17

Exploration Partners, LLC,
2006 CPD 201, 2006 WL 3734150 (Comp. Gen. Dec. 19, 2006) . . . . . . . . 8

Forman v. United States,
767 F.2d 875 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Guilltone Properties, Inc., HUDBCA No. 02-C-103-C4,
2006 WL 990150 (Mar. 30, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Hernandez,
01-1 BCA 31, ASBCA No. 53011, 2000 WL 1844742 (Dec. 12, 2000) . . 14

Kinzley v. United States,
661 F.2d 187 (Ct. Cl. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Labat-Anderson, Inc. v. United States,
50 Fed. Cl. 99 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Leonardo v. United States,
60 Fed. Cl. 126 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Maritime Administration Award-Cooperative Agreement for Privatization of Computer Aided Operations Research Facility-Reconsideration,
1998 WL 228372 (Comp. Gen. Dec. 19, 1988) . . . . . . . . . . . . . . . . . . . . 10

Mayer,
HUDBCA No. 83-823-C-20, 84-2 BCA ¶ 17,494, 1984 WL 13451 (July 11, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

Montana Human Rights Commission,
91-2 BCA 23993, 1991 WL 78528 (HUDBCA May 16, 1991) . . . . . . 10, 11

NISH v. Rumsfeld,
348 F.3d 1263 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Narva Harris Construction Corp. v. United States,
574 F.2d 508 (Ct. Cl. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 18

New Era Constr. v. United States,
890 F.2d 1152 (Fed. Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

PDR, Inc. v. United States,
78 Fed. Cl. 201 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

PacOrd, Inc. v. United States,
139 F.3d 1320 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Partridge v. Reich,
141 F.3d 920 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Prestex, Inc. v. United States,
3 Cl. Ct. 373, 377 n.5 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Report to Chair, Subcommittee on Compensation & Employee Benefits, Committee on Post Office & Civil Service, House of Representatives,
1994 WL 612302 (Sept. 12, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Rick's Mushroom Service, Inc. v. United States,
76 Fed. Cl. 250 (2007), aff'd, 521 F.3d 1338 (Fed. Cir. 2008) . . . . . . . . . . . 11

United States v. American Renaissance Lines, Inc.,
494 F.2d 1059 (D.C. Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17

United States v. Hale,
51 F.2d 629 (10th Cir. 1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

University of Rochester v. Hartman,
618 F.2d 170 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Wesleyan Co., Inc. v. United States,
454 F.3d 1375 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3

**STATUTES**

41 U.S.C. §§ 501-509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10 U.S.C. § 2371(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

15 U.S.C. § 78c(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

15 U.S.C. § 3710a(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

31 U.S.C. § 200 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

31 U.S.C. § 1501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

31 U.S.C. §§ 6301-6308 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

38 U.S.C. § 4212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

41 U.S.C. §§ 401-409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

41 U.S.C. § 602(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8, 14

42 U.S.C. § 7256(g)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**LEGISLATIVE MATERIAL**

S. Rep. 95-449, 1977 WL 9662, 1978 U.S.C.C.A.N. 11, 18 (Sept. 22, 1977) . . . . 4

S. Rep. 97-180, 1982 U.S.C.C.A.N. 3, 5 (Aug. 13, 1981) . . . . . . . . . . . . . . . . . . . 7

**PUBLIC LAW**

Pub. L. 95-224 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Pub. L. No. 97-258, 96 Stat. 877 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**REGULATIONS**

24 C.F.R. § 84.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

32 C.F.R. § 21.410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

32 C.F.R. § 21.670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

32 C.F.R. § 37.1330 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

41 C.F.R. § 60-250.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

43 Fed. Reg. 36860 (Aug. 18, 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| Lublin Corp., t/a Century 21 Advantage Gold, | ) | |
| | ) | |
| Plaintiff, | ) | No. 07-206C |
| | ) | (Judge Allegra) |
| v. | ) | |
| | ) | |
| The United States, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S SECOND NOTICE OF SUPPLEMENTAL AUTHORITY**

Pursuant to this Court's instructions during the May 13, 2008 hearing on our motion to dismiss, defendant, the United States, respectfully files this notice of supplemental authority addressing: (1) the meaning of the term "procurement" within 41 U.S.C. § 602(a)(2); and (2) the Government's position with respect to the meaning of 31 U.S.C. § 1501.

I. Lublin's Alleged Contract In This Case Is A "Procurement Contract" Under Both The Federal Grant and Cooperative Agreement Act of 1977 And The Office of Federal Procurement Policy Act And Thus Is Covered By The CDA

Although the United States Court of Appeals for the Federal Circuit, in Wesleyan Co., Inc. v. United States, 454 F.3d 1375 (2006), has twice defined "'procurement'" as "'the acquisition by purchase, lease, or barter, of property or services for the direct benefit or use of the Federal Government[,]'" 454 F.3d at 1378-79 (quoting New Era Constr. v. United States, 890 F.2d 1152, 1157 (Fed. Cir. 1989) (emphasis in original)), neither the Wesleyan nor New Era decisions limits the definition of "procurement" to instances where the Government acquires some good or service via a payment of – or a promise of payment of – cash or a cash equivalent. Moreover, the Federal Circuit's original use of that definition in New Era focused solely upon the phrase "direct benefit or use," and thus did not address the parameters of the phrase "purchase, lease, or barter." In that regard, the Federal Circuit's definition appears to originate

from the Federal Grant and Cooperative Agreement Act of 1977, the text, structure, and legislative history of which favors the Government's view here that Lublin's alleged contract is covered by the CDA. Finally, the plain meaning of "purchase, lease, or barter" likewise supports our position in this case, as does the definition of "procurement" located in the Office of Federal Procurement Policy Act.

In Wesleyan, the Federal Circuit held that certain "purchase orders . . . involve[d] the exchange of property for money, and thus involve[d] 'procurement.'" 454 F.3d at 1378. There is nothing novel about that holding, and, accordingly, the court decided that, "pursuant to the CDA, the Board possesses limited subject matter jurisdiction over this suit insofar as Wesleyan's claim involves a breach of the purchase orders, which constitute procurement contracts." Id. at 1379. In contrast, with respect to unsolicited proposals and a bailment agreement, "Wesleyan did not receive any value in exchange" and "[a]s such, . . . were donative in nature." Id. at 1378 (emphasis added).[1] In sum, Wesleyan did not attempt to resolve definitively the limits of the terms "procurement" or "procurement contract," but instead stands for the rather banal proposition that a purchase order is covered by the CDA.

Similarly, the Federal Circuit's decision in New Era is not decisive here because that decision focused narrowly on whether a particular "'acquisition'" was for the "'direct benefit or use of the Federal Government.'" 890 F.2d at 1157 (quoting Mayer, HUDBCA No. 83-823-C-20, 84-2 BCA ¶ 17,494, 1984 WL 13451 (July 11, 1984) (emphasis in original)). The contract at issue in New Era was not covered by the CDA because it "was for the financing of a

---

[1] A "bailment contract" is not a contract for a good or service. See Leonardo v. United States, 60 Fed. Cl. 126, 130 (2004) (explaining that "the court does not understand bailment to be encompassed within the goods and services procurement scheme" (emphasis added)).

procurement of construction by a nonfederal agency, the Housing Authority." Id. That is, "the contributions contract was not designed to enable HUD to procure real property but to facilitate the procurement of such property by the Housing Authority." Id. In the instant case, in contrast, plaintiff Lublin Corp. does not contest that its alleged contract was for anything other than a service for the "direct benefit or use of the Federal Government."

The genesis of the Federal Circuit's definition of "procurement" is particularly instructive. As noted above, the Federal Circuit's definition of "procurement" in Wesleyan and New Era is derived from Mayer, a decision of the Housing and Urban Development Board of Contract Appeals (HUDBCA). See 890 F.2d at 1157. In Mayer, the HUDBCA determined that Housing Assistance Payments (HAP) contracts are not covered by the CDA because "the HAP Contract itself is not in whole or in part a 'procurement' contract within the meaning of Section 3(a) of the CDA." 1984 WL 13451. In so holding, the board relied upon the definition of "procurement contract" found in the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA), and explained "that the principal purpose of the relationship created by the HAP Contract involved in this case is to transfer money as Federal assistance on behalf of qualifying lower income tenants to the recipient landlord to accomplish a public purpose of providing support for adequate housing for lower income persons." Id. (emphasis added). Thus, Mayer rested upon the fact "that the benefits to the Government provided by the HAP Contract are indirect." Id. (emphasis added); see Blanco-Mora Enters., Inc., 94-3 BCA ¶ 26974, 1994 WL 248163 (HUDBCA June 10, 1994) (discussing Mayer and New Era, and explaining board "lacks jurisdiction over contracts between public housing authorities and their . . . contractors, even though HUD funds the construction and has substantial administrative involvement under annual

contribution contracts . . ., because these contracts are not for the direct use or benefit of the Government" (emphasis added)).

The FGCAA supports our position in this case by creating an exhaustive list of three distinct types of agreements: "procurement contracts," "grant agreements," and "cooperative agreements." See 31 U.S.C. §§ 6303-05; see also S. Rep. 95-449, 1977 WL 9662, 1978 U.S.C.C.A.N. 11, 18 (Sept. 22, 1977) (discussing P.L. 95-224, FGCAA of 1977, and explaining that "[t]hese sections identify . . . three basic relationships found in transactions between Federal agencies and recipients of Federal contract and Federal assistance awards"); University of Rochester v. Hartman, 618 F.2d 170, 176 (2d Cir. 1980) ("That Congress . . . intended to establish a legal difference between grants and contracts is evident from the care with which [it] ha[s] set forth criteria for distinguishing between them.").

Thus, 31 U.S.C. § 6303 instructs that "[a]n executive agency shall use a procurement contract . . . when (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or (2) the agency decides in a specific instance that the use of a procurement contract is appropriate." 31 U.S.C. § 6303 (emphasis added). In contrast, a "grant agreement" must be used when "the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by law of the United States instead of acquiring . . . property or services for the direct benefit or use of the United States Government." 31 U.S.C. § 6304 (emphasis added).[2] In this case,

[2] The definition of a "cooperative agreement" is identical to that of "grant agreement," except that the former is required where the Government's "substantial involvement is expected," see 31 U.S.C. § 6305(2), while the latter must be used where the "substantial

Lublin's alleged contract with HUD was not "to carry out a public purpose of support or stimulation," id., and is thus undeniably is closer to a "procurement contract" than to a "grant agreement" (or "cooperative agreement") under the FGCAA.

Moreover, the legislative history of the FGCAA confirms that its purpose was to clarify and "achieve consistency in terminology" and to permit agencies "the flexibility of determining whether a given transaction or class of transactions is procurement or assistance . . . ." 1978 U.S.C.C.A.N. at 20 (emphasis added). In other words, to the extent this Court decides that only the FGCAA's definition of "procurement contract" is relevant here, the putative agreement at issue in this case must be classified as either a "procurement contract," a "grant agreement," or a "cooperative agreement." See, e.g., id. at 32 (noting that "[t]he director of OMB expressed the fear that . . . [the statute would] force thousands of transactions into one of the three definitions"). Indeed, the FGCAA's legislative history indicates that while Congress, at the suggestion of the Director of the OMB, considered whether "a separate category of transactions [should] exist which reflect neither procurement or assistance relationships," Congress ultimately "did not agree that a separate category of transactions [should] exist which reflect neither relationship." Id. at 33-34. Instead, Congress "determined that agencies should be able to state whether . . . agreements reflect a relationship whose principal purpose was either acquisition or assistance." Id. (emphasis added).[3]

---

involvement" of the Government "is not expected." 31 U.S.C. § 6304(2).

[3] OMB explained "that Pub. L. 95-224 specifically repeals the Grants Act and requires that selection of the appropriate instrument be based on the character of the specific transaction (i.e., procurement or assistance) rather than on a functional activity or class of recipient . . . ." See Implementation of Federal Grant and Cooperative Agreement Act of 1977, 43 Fed. Reg. 36860 (Aug. 18, 1978) ("The [FGCAA] distinguishes between procurement and assistance

Significantly, we have found no indication in the legislative history of the FGCAA that the phrase "purchase, lease, or barter" was intended to impose any limit on the definition of "procurement" or "procurement contract," such that the nature of consideration provided by the Government to a contractor must be in a particular form. For example, a "transmittal memorandum from the Director of OMB to the heads of Federal agencies" explains that the FGCAA "requires that . . . Federal agencies use procurement contracts to acquire property or services for the direct benefit or use of the Federal Government and grants or cooperative agreements to transfer money, property, services, or anything of value to recipients to accomplish a Federal purpose of stimulation or support authorized by statute." 43 Fed. Reg. at 36861. The Director of OMB mentions neither the phrase "purchase, lease, or barter," nor any requirement that the Government employ, for procurement contracts, certain types of consideration; rather, consistent with the rest of the legislative history discussed above, the OMB Director focused solely upon the purpose of the transaction.

The legislative history accompanying the 1982 revisions to the FGCAA likewise reflects our view that the type of consideration given to the contractor is immaterial in deciding whether the contract at issue is a "procurement contract."[4] Thus, the Senate Committee on Government

---

relationships and mandates that Federal agencies use contracts for procurement transactions . . . ."); id. at 36863 (mandating that, for "transactions or programs [with] elements of both procurement and assistance, but which cannot be characterized as having a principal purpose of one or the other, an OMB exception should be requested" (emphasis in original)).

[4] See also Jeffrey C. Walker, Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act, 26 Pub. Cont. L. J. 683, n.35 (Summer 1997) ("The Money and Finance Act, Pub. L. No. 97-258, 96 Stat. 877 (1982), moved the [FGCAA] from 41. U.S.C. §§ 501-509 to 31 U.S.C. §§ 6301-6308 without making substantial changes. The legislative history of the 1977 Act therefore remains the pertinent legislative history.").

Affairs considered a case in which "a HUD official concluded that a contract would not be the appropriate instrument to obtain an evaluation of a Federal program because the cumulative benefit to researchers, program recipients, and the general public outweighed the benefit to the Federal Government." S. Rep. 97-180, 1982 U.S.C.C.A.N. 3, 5 (Aug. 13, 1981). In concurring with the GAO, the Committee rejected the HUD official's reasoning, explaining that "[t]he Act requires no such analysis; it only requires an agency to assess the principal purpose of the Federal Government in entering into a transaction . . . ." Id. (emphasis added).

Indeed, the Committee's view was that every transactional relationship must be categorized as either a procurement contract or an assistance agreement. See id. at 6 ("Of course, once a determination has been made as to the principal purpose in a relationship, it is appropriate for an agency to further analyze the relationship to determine, if the principal purpose is procurement, the proper type of contract, or, if the principal purpose is assistance, whether the proper instrument is a grant or cooperative agreement and – if so – what form the grant or cooperative agreement should take." (emphasis added)).[5]

Where Congress intended to create a different type of transaction, not defined in the FGCAA, Congress has done so. See, e.g., 15 U.S.C. § 3710a(d)(1) (defining "cooperative research and development agreement" as "not includ[ing] a procurement contract or cooperative agreement as those terms are used in sections 6303, 6304, and 6305 of Title 31"); 10 U.S.C. § 2371(a) ("Additional forms of transactions authorized") ("The Secretary of Defense and the Secretary of each military department may enter into transactions (other than contracts,

[5] See also S. Rep. 97-180, 1982 U.S.C.C.A.N. at 6 ("When choosing between procurement and assistance, the degree of anticipated involvement is of no consequence; the choice is governed solely by the principal Federal purpose in the relationship.").

cooperative agreements, and grants) under the authority of this subsection in carrying out basic, applied, and advanced research projects. The authority under this subsection is in addition to the authority provided in section 2358 of this title to use contracts, cooperative agreements, and grants in carrying out such projects."); 42 U.S.C. § 7256(g)(1) (providing "other transactions" authority to Department of Energy).[6] In that regard, "the use of an assistance instrument to carry out a program requires authorizing legislation. That is unlike the use of a procurement contract, for which Federal agencies have inherent, Constitutional authority." 32 C.F.R. § 21.410.

Moreover, several GAO decisions confirm that the phrase "purchase, lease, or barter" is not dispositive of whether a contract is a "procurement contract." For example, the Comptroller General, in response to a congressional request, "examined the propriety of the Office of Personnel Management's (OPM) utilization of a memorandum of understanding [(MOU)]to arrange for the Center for the Study of Services [(CSS)] to conduct a customer satisfaction survey of enrollees in the Federal Employee Health Benefits Plans." Report to Chair,

---

[6] "[E]ntering and performing 'other transactions' cannot be the same as entering and performing procurement contracts." Exploration Partners, LLC, 2006 CPD ¶ 201, 2006 WL 3734150, *3 (Comp. Gen. Dec. 19, 2006) (concluding "that NASA's issuance of these Space Act agreements pursuant to its 'other transactions authority' is not tantamount to the award of contracts for the procurement of goods and services, which would be subject to our bid protest jurisdiction"); see also PDR, Inc. v. United States, 78 Fed. Cl. 201, 206 n.4 (2007) ("The CDA governs contracts entered into with the executive branch for the procurement of property, of services, or of construction, alteration, repair, or maintenance of real property, as well as contracts for the disposal of personal property. 41 U.S.C. § 602(a). As part of the Federal Technology Transfer Act of 1986, 15 U.S.C. § 3710a et seq. (2000), Congress 'intended to establish a new type of contractual relationship between a federal laboratory and a non-federal party for research and development purposes.' Chem Serv. v. Environmental Monitoring Sys. Laboratory-Cincinnati, 12 F.3d 1256, 1258 (3d Cir. 1993). In order to memorialize this new contractual relationship, Congress created the Cooperative Research and Development Agreement, with the specific intent that it not be a procurement contract. Id.").

Subcommittee on Compensation & Employee Benefits, Committee on Post Office & Civil Service, House of Representatives, Comp. Gen. B-257430, 1994 WL 612302, *1 (Sept. 12, 1994). Although "OPM agreed to make contacts with the carriers to facilitate the survey," OPM "declined to order them to participate in the survey on the basis that it was not being performed under the control of or for the direct benefit of OPM." Id. The MOU also provided "that the survey and the study [were] to be performed at no cost to the United States Government or to OPM" and that "CSS is to provide OPM with the raw survey data at no charge." Id.

OPM argued that "its arrangement with CSS yields only incidental benefits to OPM and therefore the arrangements should be viewed as an 'assistance relationship' under criteria set forth in the [FGCAA] of 1977, 31 U.S.C. §§ 6301-6308." Id. at *2. In particular, OPM noted "that CSS is not entitled to any payments of cash or property from the government." Id. at *3. The GAO disagreed, concluding that it is "inclined to view OPM's arrangement with CSS as an acquisition of CSS's services in support of OPM's statutory obligations." Id. at *4 (discussing numerous similar cases in which GAO found "a procurement for services for the purposes of [GAO's] bid protest jurisdiction"). Indeed, the GAO noted that it has found a procurement for services "notwithstanding the fact that the arrangement did not make use of appropriated funds and that the actual 'buyers' of the firm's services were individuals and entities" other than the Government. Id.

Indeed, the GAO repeatedly has held that, in assessing whether a transaction is a procurement, "'[t]he key question is this: Is the principal purpose to serve the immediate needs of the federal government, or is it to provide assistance to a non-federal entity in serving a public purpose?'" Id. at *5 (citing GAO decisions). Again, we note that GAO found a procurement of

services in the CSS case due to the "the primary purpose of OPM's arrangements with CSS as obtaining services for OPM's direct benefit and use, rather than serving an independent public purpose." Id.; see also Maritime Administration Award–Cooperative Agreement for Privatization of Computer Aided Operations Research Facility–Reconsideration, 1998 WL 228372, *1 (Comp. Gen. Dec. 19, 1988) ("The question [the FGCAA] raises is whether the principal purpose of the transaction is to transfer a thing of value to the recipient to carry out a public purpose of support or stimulation . . ., or whether it is to acquire property or services (including lease or barter) for the direct benefit or use of the United States." (emphasis added)).[7]

Likewise, the HUDBCA itself has explained that the key question is whether an "agreement "serv[es] the immediate needs of, or [is] of direct benefit to, the federal government." Montana Human Rights Commission, 91-2 BCA ¶ 23993, 1991 WL 78528 (HUDBCA May 16, 1991) ("The satisfaction of such an immediate need, or the provision of a direct benefit to HUD, would require HUD to enter into a procurement contract."); see also Chem Service, Inc. v. Environmental Protection Agency, 12 F.3d 1256, 1266 n.11 (3d Cir. 1993) ("Ultimately, the question is whether the principle [sic] purpose of the contract is to acquire property or services for the direct benefit or use of the federal government, or to transfer a thing of value to the recipient to carry out a public purpose of support or stimulation authorized by a law. . . . If the

---

[7] In the Maritime Administration case, "the agency planned to privatize [a] facility by selecting a private organization to operate and maintain [a] simulator at no cost to the government in return for the right to market research and training on the simulator to government agencies and the private sector." Ship Analytics, Inc., 87-2 CPD ¶ 590, 1987 WL 103301, *2 (Comp. Gen. Dec. 15, 1987) (emphasis added). The GAO concluded that "the agency in effect thus was procuring goods or services." Id. at *1.

former, then a federal agency is required to utilize a procurement contract and comply with the federal procurement laws.")[8]

In Montana Human Rights Commission (MHRC), the appellant argued that its agreement with HUD was, "in effect, a procurement contract for services within the purview of the CDA, despite its Cooperative Agreement appellation." 91-2 BCA ¶ 23993, 1991 WL 78528. Relying upon Meyer and the FGCAA, the board concluded that appellant's agreement was not a procurement contract because "[a]ny benefit accruing to HUD would be indirect." Id. Indeed, there, as in this case, the alleged "benefit" was that "of information sharing." Id. The dispositive difference, however, is that while "the handling of certain anti-discriminatory actions undertaken by the State of Montana coincided with similar enforcement actions by HUD based on federal Title VIII violations[,]" the benefit to HUD was indirect because the "primary purpose" of the agreement "was to provide financial and training assistance to MHRC so that MHRC could process discrimination complaints arising under Montana's fair housing laws." Id. (emphasis added). Again, in this case, there is no dispute that the information Lublin allegedly provided to HUD was anything other than for the Government's direct benefit.

The approach we urge also has been followed in at least one case from this Court, and affirmed by the Federal Circuit. See Rick's Mushroom Service, Inc. v. United States, 76 Fed. Cl. 250, 256-58 (2007), aff'd, 521 F.3d 1338 (Fed. Cir. 2008). In that case, plaintiff argued that the

[8] See also 24 C.F.R. § 84.11 (HUD regulation providing that "[c]ontracts shall be used when the principal purpose [of a transaction] is acquisition of property or services for the direct benefit or use of the Federal Government"); 32 C.F.R. § 21.670 (DoD regulation defining "[p]rocurement contract" as a "legal instrument which, consistent with 31 U.S.C. 6303, reflects a relationship between the Federal Government and a . . . recipient when the principal purpose of instrument is to acquire property or services for the direct benefit or use of the Federal Government"); 32 C.F.R. § 37.1330 (same).

agreement at issue was a "procurement contract," while the Government argued that it constituted a "cooperative agreement." This Court, discussing the FGCAA's definitions of the foregoing terms, agreed with the Government, and explained:

> Examination of the NRCS Agreement reveals that it does not contemplate transfer of goods or services directly to the Government; no evidence of a buyer-seller relationship is evident; and no direct benefit accrues to the Government as a result of the operation of the SMS Transfer Facility. The NRCS Agreement was entered into "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," 31 U.S.C. § 6305, and thus falls within the category of cooperative agreements, rather than procurement contracts.

Id. at 258 (emphasis added); see also 521 F.3d at 1344 ("The Court of Federal Claims went through a lengthy analysis explaining why the cost-share agreement is not a procurement contract. In particular, the court noted that the agreement did not provide for transfer of goods or services to the government, there was no evidence of a buyer-seller relationship, and the government did not receive a direct benefit from the operation of the SMA transfer facility. We find the court's analysis to be sound.").

We further note that the plain meaning of the term "procurement" and the phrase "purchase, lease, or barter" supports the Government's position. For example, Black's Law Dictionary defines procurement broadly as "[t]he act of getting or obtaining something." See Black's Law Dictionary (8th ed. 2004). A "purchase" similarly is broadly defined as "[t]he act or an instance of buying" or "[t]he acquisition of real property by one's own or another's act . . . rather than by descent or inheritance. Id. (emphasis added). Indeed, a "purchaser" is "one who obtains property for money or other valuable consideration." Id. (emphasis added); see also Partridge v. Reich, 141 F.3d 920, 923 (9th Cir. 1998) (explaining that "[a]lthough Congress did

not specifically define 'contract for procurement' in [38 U.S.C.] § 4212, the Department of Labor in its administration of the Act has promulgated regulations defining the term" to include "'any agreement ... between any contracting agency and any person for the furnishing of supplies or services or for the use of real or personal property . . . .'"); id. at 923-24 (upholding Labor's definition of procurement contract at 41 C.F.R. § 60-250.2, and noting that "its language refers to agreements to furnish supplies, services, or for the use of property. Thus, . . . the regulation does not apply to all agreements between the federal government and third parties[,] . . . . [but] [r]ather, the regulation speaks in procurement contract terms").[9]

Several court decisions interpreting those terms in other contexts mirror the foregoing definitions. Thus, for example, the United States Court of Appeals for the Sixth Circuit, analyzing a tax statute, held that "the most likely reason suggested by" the legislative history for why that statute's"language was changed from 'acquisition' to 'purchases'" is that Congress wanted to distinguish between an "acquisition . . . by purchase" and that "by gift or device." Dettmers v. Commissioner, 430 F.2d 1019, 1022-23 (6th Cir. 1970) (noting that "real property is acquired either upon the delivery of the deed or upon the transfer of the benefits and burdens of ownership of the property" (emphasis added)). Likewise, in United States v. Hale, the court acknowledged "the fundamental doctrine sustained by the authorities that a title by purchase includes every known method of acquiring an estate except that by which it passes to an heir by operation of law." 51 F.2d 629, 631 (10th Cir. 1931) (emphasis added).[10]

---

[9] Cf. 15 U.S.C. 78c(13) (securities statute defining "buy" and "purchase" to "include any contract to buy, purchase, or otherwise acquire" (emphasis added)).

[10] Cf. J.W. Burress, Inc. v. JLG Indus., Inc., 491 F. Supp. 15, 18 (W.D. Va. 1980) (holding, in the antitrust context, that "a 'purchase' has [not] occurred until buyer and seller have

Finally, and significantly, the Federal Circuit has agreed with the Government that 41 U.S.C. §§ 401-409 "should be read in pari materia with the Disputes Act[,]" particularly with respect to Section 3 of the latter, 41 U.S.C. § 602. Forman v. United States, 767 F.2d 875, 878 (Fed. Cir. 1985) (explaining that the Office of Federal Procurement Policy Act "presents a list of contracts to which the statute applies, which is in pertinent parts identical to the corresponding section (§ 3) of the Disputes Act"). The Federal Circuit held that "[b]ecause the phrases in the two statutes are almost identical and because they focus on the same object – Government procurement – we assume for the purposes of this appeal that Congress intended the phrase to have the same meaning in the Disputes Act as it had in the earlier Policy Act." Id.

Accordingly, we again observe, as we did in our first supplemental brief, that although the CDA does not define the term "procurement," section 403 of that same title defines "procurement" to "include[] all stages of the process of acquiring property or services, beginning with the process for determining a need for property or services and ending with contract completion and closeout." See 41 U.S.C. § 403(2); see also Labat-Anderson, Inc. v. United States, 50 Fed. Cl. 99 (2001) (noting that "Congress has defined the term ['procurement'] broadly in 41 U.S.C. § 403(2)"); Hernandez, 01-1 BCA ¶ 31,220, ASBCA No. 53011, 2000 WL 1844742 (Dec. 12, 2000); NISH v. Rumsfeld, 348 F.3d 1263, 1272 (10th Cir. 2003) (holding that "[t]he definition of 'procurement' contained in 41 U.S.C. § 403 is sufficiently broad" to encompass "the authorization of vending facilities on federal property").

---

completed their negotiations and have in some way expressed their mutual assert that legally enforceable expectations and commitments arise. In short, there must be a contract. It is sufficient that the contract be merely executory; actual delivery and payment are not essential to a 'purchase' . . . ." (emphasis added)).

II. Lublin's Allegation Of An Express Oral Contract Is Precluded By 31 U.S.C. § 1501(a)

As the United States Court of Appeals for the District of Columbia Circuit has held, 31 U.S.C. § 1501(a)(1)(A) "establishes . . . that contracts which are merely oral are not enforceable." United States v. American Renaissance Lines, Inc., 494 F.2d 1059, 1062 (D.C. Cir. 1974) (discussing 31 U.S.C. § 200 (1970)). The court explained that "Congress was concerned that the executive might avoid spending restrictions by asserting oral contracts, and so enacted the requirement of a writing." Id. In so holding, the D.C. Circuit relied, in part, upon the Supreme Court's decision in Clark v. United States, 95 U.S. 539 (1877), which the circuit court explained involved a statute "similar to the statute here in that it required government contracts of certain departs to be in writing." 494 F.2d at 1063. Accordingly, the D.C. Circuit "view[ed] the statute as establishing a requirement that a government contract . . . be in writing before either party may be allowed to obtain court enforcement of the agreement." Id. at 1064 (explaining that "[a]lthough the statute simply bars recording oral contracts as obligations of the Government, this does not mean that recordation is the only purpose or effect of the statute"); see also id. at 1068 ("[I]t appears impossible to give effect to the avowed primary objective of Congress without construing the 1955 Act as a statute of frauds.").[11]

Given the United States Court of Claims' holding in Narva Harris Construction Corp. v. United States, 574 F.2d 508 (Ct. Cl. 1978), that the previous version of 31 U.S.C.

---

[11] In support of the holding in American Renaissance, the court of appeals cited the then-existing procurement regulations, which required – as the FAR does today – contracts to be in writing. The court explained, however, that the regulation "does not require a formal two-signature document, but it does require some form of writing, whether letters of intent, or purchase orders, or some other written manifestation." 494 F.2d at 1065. Lublin has not alleged the existence of any such written documentation.

§1501(a)(1)(A) does not preclude recovery on an alleged implied-in-fact contract, we concede that, as the law stands now in this Court, Lublin's claim based on an implied-in-fact contract cannot be dismissed based solely upon 31 U.S.C. § 1501(a)(1)(A).[12] However, Narva Harris does not address Lublin's alternative claim of an express oral contract. 574 F.2d at 510 ("We do not now decide whether the Government's interpretation of § 200 with regard to the express oral contract is correct."); see also Kinzley v. United States, 661 F.2d 187, 190 n.2 (Ct. Cl. 1981) (leaving open the question "whether this section would prevent the enforcement of an express oral contract" and commenting that Narva Harris also "left the question open"); Am. Gen. Leasing, Inc. v. United States, 587 F.2d 54, 56 (Ct. Cl. 1978) (declining to answer same question but holding express oral contract barred by Federal Procurement Regulations).

Indeed, there is no reason why § 1501(a)(1)(A) cannot be construed both to permit implied-in-fact contracts – under Narva Harris and in light of the Tucker Act – and also to preclude the assertion of bare, express oral contracts. If such a construction were patently impossible, there would have been no reason for Narva Harris – and two other panels of the Court of Claims – to decline to address the issue. Indeed, even the court in Narva Harris opined that an express oral contract simply is a weaker claim, commenting that there is "a valid distinction to be drawn between the naked, express oral contract at which § 200 may be directed, and the 'additional facts' from which a contract implied-in-fact could be inferred." 574 F.2d at 510 ("A stark assertion by an individual that a Government representative had orally promised

[12] We concur with the dissent in PacOrd, Inc. v. United States, 139 F.3d 1320 (9th Cir. 1998), that Narva Harris "is just plain wrong." Id. at 1324. Indeed, the D.C. Circuit correctly construed 31 U.S.C. § 1501(a)(1) as a statute of frauds (in line with earlier Supreme Court decisions, construing similar statutes, addressed in our November 13, 2007 reply brief). See 494 F.2d at 1068; see also Def. Reply at 5-9.

some performance might, without more, be insufficient to bind the Government."); see also id. (observing "that plaintiff may be able to prove facts, in addition to the alleged express oral contract, from which a contract may be inferred"). This construction thus accounts for both the Tucker Act's conferral of jurisdiction on this Court over contacts implied-in-fact, and the legislative history and plain meaning of § 1501(a)(1)(A) as articulated by the D.C. Circuit. See 494 F.2d at 1068 ("[I]t appears impossible to give effect to the avowed primary objective of Congress without construing the 1955 Act as a statute of frauds.").

The GAO agrees with this position: "While there may be some room for interpretation as to what constitutes a 'writing' for the purposes of 31 U.S.C. § 1501(a)(1), the writing, in some acceptable form, must exist. Under the plain terms of the statute, an oral agreement may not be recorded as an obligation." 7 GAO Redbook pt. B, § 1 (Principles of Federal Appropriations Law (3d ed. Feb. 2006)), 2006 WL 2620946 (emphasis added) (explaining that, in American Renaissance, "the court found that 31 U.S.C. § 1501(a)(1) 'establishes virtually a statute of frauds' for the government and held that neither party can judicially enforce an oral contract in violation of the statute").

Finally, numerous lower court decisions have applied 31 U.S.C. § 1501 in the manner we suggest. See, e.g., Essex Electro Engineers, Inc. v. United States, 2008 WL 782740, *6 (Fed. Cl. Feb. 20, 2008) (citing 31 U.S.C. § 1501(a)(1)(A) and 48 C.F.R. § 2.101 (2007) and noting "[t]he requirement of a writing"); Prestex, Inc. v. United States, 3 Cl. Ct. 373, 377 n.5 (1983) (citing 31 U.S.C. § 1501 (1983) for the proposition that, "[t]o the extent that plaintiff's contract claim is based on an express oral contract, it fails on the additional ground that it violated the statutory requirements that an agreement be in writing in order to bind the government"); Guilltone

Properties, Inc., HUDBCA No. 02-C-103-C4, 2006 WL 990150 (Mar. 30, 2006) (citing 31 U.S.C. § 1501 and cases for the proposition that "[d]ocumentary evidence is required to prove the existence of an enforceable oral contract with the Government").

In sum, we do not abandon the argument that Narva Harris was wrongly decided. Nor, for that matter, do we abandon our view that 31 U.S.C. § 1501 bars, at the very least, naked express oral contracts, of the type Lublin has alleged in Count II of its amended complaint.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Mark A. Melnick by s/ B. Snee
MARK A. MELNICK
Assistant Director

s/ Matthew H. Solomson
MATTHEW H. SOLOMSON
Trial Attorney, Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit, 8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 305-3274
Fax: (202) 514-8624

June 3, 2008

Attorneys for Defendant