# In The United States Court of Federal Claims

No. 07-206C

(Filed:  December 3, 2008)
_____

| | |
|---|---|
| LUBLIN CORPORATION, t/a CENTURY 21, ADVANTAGE GOLD, | ∗  Contract case; Motion to dismiss under |
| | ∗  RCFC 12; Alleged breach of oral contract; |
| | ∗  Applicability of Contract Disputes Act; |
| Plaintiff, | ∗  Oral contract was not for the "procurement |
| | ∗  of services" within the meaning of 41 |
| v. | ∗  U.S.C. § 602(a); Definition of term |
| | ∗  "procurement;" *Institute Pasteur* applied; |
| THE UNITED STATES, | ∗  31 U.S.C. § 1501(a); Section 1501(a) is not |
| | ∗  a statute of frauds rendering oral (and |
| Defendant. | ∗  implied-in-fact) contracts unenforceable; |
| | ∗  Language, structure, and history of section |
| | ∗  1501(a) reviewed; *American Renaissance* |
| | ∗  not followed; Motion to dismiss denied. |

_____

**OPINION**
_____

*William F. Thomson, Jr.,* Gilbert & Thomson Law Offices, Fairless, PA, for plaintiff.

*Matthew H. Solomson*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Gregory G. Katsas*, for defendant.

**ALLEGRA, Judge:**

> "[T]he plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover."

> – *Lynch v. Alworth-Stephens Co.*, 267 U.S. 364, 370 (1925).

Waivers of sovereign immunity cannot be implied but "must be unequivocally expressed," *Lane v. Peña*, 518 U.S. 187, 192 (1996), and must be construed "strictly in favor of the sovereign." *Library of Congress v. Shaw*, 478 U.S. 310, 318 (1986).[1]  Rare is the

_____

[1]  *See also Orlando Food Corp. v. United States*, 423 F.3d 1318, 1320 (Fed. Cir. 2005). In a recent opinion, the Supreme Court took a slightly narrower view of these principles, saying that "[t]he sovereign immunity canon is just that – a canon of construction," adding that "we

jurisdictional motion in which the government does not invoke these canons at least once.  Yet, here, seeking to dismiss claims relating to an alleged oral contract, defendant uncharacteristically argues for a latitudinous interpretation of the Contract Disputes Act (CDA) – one broad enough, not coincidentally, to ensnare plaintiff's claims in the administrative exhaustion requirements of that statute.  As a second ground for dismissal, defendant returns to its roots in contending that, under a narrowing construction of 31 U.S.C. § 1501(a), unwritten agreements between the United States and other persons are unenforceable under the Tucker Act.  Both arguments are novel – more importantly, both are wrong.

## I.    BACKGROUND[2]

Plaintiff, Lublin Corporation, t/a Century 21 Advantage Gold, is a Pennsylvania corporation that sells real estate.

The Department of Housing and Urban Development (HUD) entered into a contract with Hooks Van Holm, Inc. (HVH), which established HVH as the prime contractor to HUD for managing, marketing, and overseeing the sale of HUD-owned single family homes in Pennsylvania.  On September 13, 2004, HVH awarded a subcontract to plaintiff to provide brokerage listing services.  Under the contract, plaintiff was to place HUD-owned single family properties on a local listing service and field inquires regarding the properties.  The subcontract initially ran from September 18, 2004, through October 1, 2005, promising plaintiff a fee of $321 for each property that closed.

On March 30, 2005, HUD asked plaintiff to participate in a confidential Quality Management Review (QMR) program.  This review was designed to measure the effectiveness of HVH's performance in implementing HUD's Property Disposition Program.  Plaintiff alleges that its representatives were reluctant to provide information that might reflect poorly on HVH for fear of reprisals.  It avers that before agreeing to participate in the QMR process, it received specific oral assurances from defendant's agents that all feedback provided during the QMR process would be kept strictly confidential and not be provided to HVH.  Relying upon these assurances, plaintiff's representatives provided to HUD their candid assessment of HVH's performance under the Property Disposition Program.  That feedback apparently was not all positive.

Within hours after the feedback session ended, plaintiff received an e-mail from HVH notifying it that its subcontract with HVH was being unilaterally terminated.  The termination was later confirmed by letter.  Plaintiff avers that the contract's termination was the direct result

---

have never held that it displaces the other traditional tools of statutory construction." *Richlin Sec. Serv. Co. v. Chertoff*, 128 S. Ct. 2007, 2019 (2008).

[2]  These facts are drawn from plaintiff's amended complaint, and, for purpose of this motion, are assumed to be correct.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

of HUD's agents contacting HVH in the hours following the QMR and disclosing information provided by plaintiff during the QMR process.

On March 29, 2007, plaintiff filed its original complaint in this court, asserting a claim for breach of fiduciary duty.  On April 19, 2007, defendant filed a motion to dismiss, arguing that the court lacked jurisdiction because the claim sounded in tort.  On August 7, 2007, the court heard oral argument on defendant's motion, after which it granted plaintiff leave to amend its complaint.  On September 7, 2007, plaintiff filed an amended complaint asserting two claims: (i) breach of implied-in-fact contract; and (ii) breach of express contract.

On September 21, 2007, defendant filed a motion to dismiss the amended complaint for lack of jurisdiction under RCFC 12(b)(1) and for failure to state a claim under RCFC 12(b)(6), or, in the alternative, for summary judgment under RCFC 56.  Defendant argued that the court lacked jurisdiction because plaintiff failed to submit a claim to a HUD contracting officer prior to filing its complaint as required by the Contract Disputes Act of 1978 (CDA).  It also asserted that the complaint failed to state a claim because plaintiff's claim for breach of an express oral contract is barred by 31 U.S.C. § 1501.  Defendant further argued that it was entitled to summary judgment because the HUD officials named in the complaint lacked authority to enter into the alleged contract.  On April 11, 2008, the court ordered that it would hear oral argument only on the motion to dismiss, which argument was held on May 13, 2008.[3]  At the argument, the parties were ordered to submit supplemental briefs on several issues, which have now been filed.

## II.   DISCUSSION

Deciding a motion to dismiss "starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed."  *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997) (citations omitted); *see also Bell Atl. Corp.*, 127 S. Ct. at 1964-65.  The plaintiff must establish both that the court has subject matter jurisdiction over its claims and that those claims are ones upon which relief may be granted.  *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Hansen v. United States*, 65 Fed. Cl. 76, 94 (2005).

As mentioned, defendant makes two banner claims here.  First, it asserts that this court lacks jurisdiction because plaintiff failed to comply with the jurisdictional prerequisites for bringing a suit in this court under the Contract Disputes Act (CDA), 41 U.S.C. § 601, *et seq*.  Second, it asserts plaintiff's complaint fails to state a claim because 31 U.S.C. § 1501 renders oral contracts unenforceable.  The court will consider these arguments *seriatim*.

---

[3]  The court declines to consider, at this time, defendant's lack of authority argument.  Discovery in this case has not yet occurred.  While RCFC 56(f) might allow for limited discovery on the authority issue, the court believes that such discovery neither can be effectively conducted nor is advisable.  Among other things, resolution of the authority issue here will require considering whether the officials in question had actual or implied actual authority.  *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989).

### A.    Applicability of the Contract Disputes Act

This court's jurisdiction over government contract claims is multi-faceted and derives from several statutory sources.  One of these, the Tucker Act, states, in relevant part, that – "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States."  28 U.S.C. § 1491(a)(1).  In addition, this court has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under . . . the Contract Disputes Act of 1978 [(CDA)]."  28 U.S.C. § 1491(a)(2); *see also Applied Cos. v. United States*, 144 F.3d 1470, 1477 (Fed. Cir. 1998).  Unlike the Tucker Act, under the CDA, jurisdiction is lacking "unless the contractor's claim is first presented to the contracting officer and that officer renders [or is deemed to render] a final decision on the claim."  *England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004) (citing 41 U.S.C. § 605(a)); *see also D.L. Braughler Co., Inc. v. West*, 127 F.3d 1476, 1480 (Fed. Cir. 1997); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541-42 (Fed. Cir. 1996); *Bath Iron Works Corp. v. United States*, 20 F.3d 1567, 1578 (Fed. Cir. 1994).  Defendant claims that the contract in question is covered by the CDA and that plaintiff failed to meet the jurisdictional prerequisite for bringing a suit under that statute because it did not file a claim with a contracting officer.

The CDA, however, does not apply to all government contracts.  *Coastal Corp. v. United States*, 713 F.2d 729, 730 (Fed. Cir. 1983); *Rick's Mushroom Serv., Inc. v. United States*, 76 Fed. Cl. 250, 257 (2007), *aff'd*, 521 F.3d 1338 (Fed. Cir. 2008).  Its scope is defined by 41 U.S.C. § 602(a), which states –

> Unless otherwise specifically provided herein, this chapter applies to any express or implied contract . . . entered into by an executive agency for--
>
> (1) the procurement of property, other than real property in being;
>
> (2) the procurement of services;
>
> (3) the procurement of construction, alteration, repair or maintenance of real property; or,
>
> (4) the disposal of personal property.

*See North Star Steel Co. v. United States*, 477 F.3d 1324, 1331-32 (Fed. Cir. 2007); *G.E. Boggs & Assocs., Inc. v. Roskens*, 969 F.2d 1023, 1026-27 (Fed. Cir. 1992); *Coastal Corp.*, 713 F.2d at 730.  Defendant asserts that the oral agreement alleged by plaintiff was a contract for the "procurement of services," thereby triggering the provisions of the CDA that required the filing and denial of a claim as a jurisdictional prerequisite to maintaining an action in this court.  There are, however, several reasons why this is not the case.

The court, of course, begins its analysis with the language of section 602(a).  *See Bailey v. United States*, 516 U.S. 137, 144 (1995); *United States v. John C. Grimberg Co., Inc.*, 702 F.2d 1362, 1365 (Fed. Cir. 1983).  While one might dispute whether providing feedback is a "service,"[4] the parties' debate here has focused on whether the transaction in question was a "procurement" within the meaning of that provision.  Familiar lexicons provide a variety of definitions for "procurement," the most relevant of which, perhaps, is "[t]he action or process of obtaining by care or effort; acquisition, attainment, getting, gaining."  XII The Oxford English Dictionary 559 (2d ed. 1998).  Tracking this definition, the term "procurement" is defined by the CDA to include "all stages of the process of acquiring property or services."  41 U.S.C. § 403; *see also Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300, 304 (2008); 31 U.S.C. § 6303.  Although the statute does not further define "acquiring," the Federal Acquisition Regulations (FAR) provide ready assistance in this regard.  They treat the terms "procurement" and "acquisition" as being interchangeable.  48 C.F.R. § 2.101(b)(2).[5]  The latter term is then defined thusly –

> *Acquisition* means the acquiring by contract with appropriated funds of supplies or services . . . by and for the use of the Federal Government through purchase or lease, whether the supplies or services are already in existence or must be created, developed demonstrated and evaluated.  Acquisition begins at the point when agency needs are established and includes the description of requirements to satisfy agency needs, solicitation and selection of sources, award of contract, contract financing, contract performance, contract administration, and those technical and management functions directly related to the process of fulfilling agency needs by contract.

*Id.*; *see also* 48 C.F.R. § 3.104-1 (similarly defining the phrase "Federal agency procurement"); *Marketing and Mgmt. Info, Inc. v. United States*, 57 Fed. Cl. 605, 671 (2003).  The same regulation defines a "contract" as a "mutually binding legal relationship obligating the seller to furnish the supplies or services . . . and the buyer to pay for them."  48 C.F.R. § 2.101(b)(2).

Consistent with these definitions, the Federal Circuit has held that a procurement is "the acquisition by purchase, lease or barter, of property or services for the ***direct*** benefit or use of the Federal Government."  *New Era Constr. v. United States*, 890 F.2d 1152, 1157 (Fed. Cir. 1989)

---

[4]  *Compare Hayes v. U.S. Postal Serv.*, 859 F.2d 354, 356-57 (5th Cir. 1988) (holding that the solicitation of suggestions to improve an agency's efficiency is the procurement of a service within the meaning of the CDA) *with Hayes v. United States*, 20 Cl. Ct. 150, 153-54 (1990) (holding that the solicitation of suggestions was not a procurement of services), *aff'd on other grounds*, 928 F.2d 411 (Fed. Cir. 1991).

[5]  The definition of "procurement" in the FAR reads simply "see acquisition."  48 C.F.R. § 2.101(B)(2).  As this court has noted, "both the FAR and this court consistently [have] used the terms acquisition and procurement interchangeably."  *Marketing and Mgmt. Info., Inc. v. United States*, 57 Fed. Cl. 665, 671 (2003) (citing authorities).

(emphasis in original).[6]  As outlined in the FAR, such an "acquisition" requires that the Government obtain goods or services in exchange for some obligation of appropriated funds.  In the case *sub judice*, however, there was no obligation by the defendant to pay for the "services" provided by plaintiff using appropriated funds (or any funds, for that matter).  Rather, the alleged agreement to provide feedback here was what the Federal Circuit has described as being "donative in nature."  *Wesleyan Co.*, 454 F.3d at 1378; *see also Gutz v. United States*, 45 Fed. Cl. 291, 299 (1999).  Thus, there was no acquisition by purchase.  Nor did any acquisition here occur by virtue of a barter.  What plaintiff got for the information it provided – essentially a promise of confidentiality and perhaps some incidental goodwill – had no discernable value. While that promise and benefits provided adequate consideration for a contract to arise,[7] they do not constitute the sort of "'specific property susceptible of valuation,' as would be required for barter."  *Institut Pasteur v. United States*, 814 F.2d 624, 628 (Fed. Cir. 1987) (quoting Black's Law Dictionary 1200 (5th ed. 1979)); *see also United States v. Martin*, 5 C.M.R. 102, 105 (1952).[8]  Accordingly, it would appear that the transaction in question was not a "procurement" of services within the meaning of section 602(a).

This conclusion finds strong support in the decisional law.  In *Institute Pasteur*, *supra*, at issue was whether a research collaboration agreement between a foreign research institute and the National Cancer Institute, designed to facilitate the transfer of AIDS-related virus samples, was a contract for the "procurement of services" within the meaning of the CDA.  814 F.2d at 625-27. Guided by the CDA's legislative history and underlying regulations, the Federal Circuit observed that the statute reveals "an emphasis on a buyer-seller relationship and an expenditure of government funds."  *Id.* at 627.  Finding that neither of these circumstances was present, the court ruled that the transaction "was closer to being donative in nature than it was to the contracts for procurement of property and services which Congress contemplated including within the scope of the Contract Disputes Act."  *Id.* at 628.  In so holding, the court acknowledged that "application of complex, burdensome, and inevitably time-consuming procurement regulations to the type of scientific collaboration here involved would 'not do justice to the realities of the

---

[6]  *See also Wesleyan Co., Inc. v. Harvey*, 454 F.3d 1375, 1378 (Fed. Cir. 2006); *Arbitraje Casa de Cambio v. United States*, 79 Fed. Cl. 235, 240 (2007); *The Sweetwater, A Wilderness Lodge LLC v. United States*, 72 Fed. Cl. 208, 226 (2006).

[7]  Under the Restatement, consideration need not take the form of specific property susceptible of valuation, but constitutes, more broadly, "any performance which is bargained for."  Restatement (Second) Contracts § 72; *see also id*. at §§ 71, 73-81; *Oceanic S.S. Co. v. United States*, 586 F.2d 774, 789 (Ct. Cl. 1978).

[8]  *New Era*'s definition of "procurement" may be somewhat outdated as it tracks the definition of that term as then found in the Federal Procurement Regulations (FPR), 32 C.F.R. § 1-201.13 (1983).  The latter definition included the reference to "barter;" the current FAR do not.  *See Marketing and Mgmt. Info.*, 57 Fed. Cl. at 671-72.  Accordingly, a reasonable argument can be made that barter should no longer be included in the definition of "procurement."  *Id*.  The court need not resolve this point as it concludes that the transaction in question was not a barter at all events.

situation.'" *Id.* (quoting *Texas State Comm'n for the Blind v. United States*, 769 F.2d 400, 406 (Fed. Cir. 1986)).[9] It thereby concluded that the plaintiff could proceed with its contract claim despite having not submitted a claim to the contracting officer before pursuing judicial action. *Id.* at 627.

Later cases have hewn to this practical view of the scope of the CDA.  In *Coastal Corp.*, 713 F.2d at 730, for example, the Federal Circuit held that an implied contract to treat bids fairly was not a contract for goods or services within the scope of the CDA, rejecting the notion that the CDA applied to "other contracts tangentially connected with government procurement of goods and services." *Id.*  As well, in *G.E. Boggs & Assocs., Inc. v. Roskens*, *supra*, the Federal Circuit refused to apply the CDA to an agreement through which USAID provided certain assurances to a contractor working with Syria, noting that the regulations "emphasize the buyer-seller relationship" and that the contractor and the United States lacked such a relationship.  969 F.2d at 1026-27.  Most recently, in *Wesleyan Co.*, *supra*, that same court  held that a contract in which a contractor provided the Army with information subject to assurances of confidentiality was not a "procurement" because the contract was "donative" under which the contractor "did not receive any value in exchange."  454 F.3d at 1378.  In short, then, the courts have refused to stretch the language of the CDA to cover contracts that do not arise from a typical "acquisitive" relationship and the expenditure of appropriated funds or some other exchange of recognized value – precisely the situation that the court faces here.[10]

---

[9]  Defendant boldly contends that *Institut Pasteur* ought to be "limited to the facts therein," based upon criticism leveled at that decision in *Oroville Tonasket Irr. Dist. v. United States*, 33 Fed. Cl. 14 (1995).  The criticism in *Oroville*, however, barely scratches the appellate court's rationale, primarily focusing only on the Federal Circuit's supposed misreliance upon a particular passage of the statute's legislative history.  *Id.* at 23.  Even were this "criticism" more compelling – which it is not – that  would not give this court call to depart from what is undeniably binding precedent.  *See Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, our court, and our predecessor court, the Court of Claims.").  At all events, as the following discussion demonstrates, the *Institut Pasteur* has been broadly followed.

[10]  *See also Aribtraje Casa de Cambio*, 79 Fed. Cl. at 240 (alleged oral agreement between exchange houses and the U.S. Postal Service was not a contract for the procurement of services within the meaning of the CDA); *Bailey v. United States*, 46 Fed. Cl. 187, 211 (2000) (contract to provide assistance to government in repatriating foreign assets not within the purview of the CDA); *Lucas v. United States*, 25 Cl. Ct. 298, 304-04 (1992) (contract created by design competition concerning Korean War memorial was not a contract for the "procurement of services" within the meaning of the CDA); *see generally*, *Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1352 (Fed. Cir. 1983) (per curiam).

Defendant's contrary argument turns a blind eye to whether the "application of complex, burdensome, and inevitably time-consuming procurement regulations" to this type of contract would "do justice to the realities of the situation." *Institut Pasteur*, 814 F.2d at 627-28. Defendant's invocation of the CDA, in fact, is nothing short of *surreal*, with a decidedly hollow ring. If it is right, then a government agency must conduct a formal procurement every time it seeks feedback, at least with assurances of confidentiality – presumably, not only when it seeks information from contractors, but any other potential sources. The practical feasibility of doing this is doubtful, even assuming the most accommodating procurement procedures. But, not to worry, for while defendant has made arguments like this periodically, it does not appear to have operationally moved toward requiring that agreements like the one at issue be treated as formal procurements. Indeed, with no apparent sense of irony, defendant inveighs that plaintiff failed to file a claim with the contracting officer and await a final decision from that officer, all the while skating over the slightly inconvenient fact that HUD never appointed a contracting officer here. Most likely that is because it never occurred to the agency that it needed to conduct a "procurement of services" in order to approach one of its subcontractors for a few hours of feedback. *See Dalton v. Sherwood Van Lines, Inc.*, 50 F.3d 1014, 1019-20 (Fed. Cir. 1995) (citing the absence of a contracting officer as indication that an agreement was not subject to the CDA). And if, as defendant essentially argues, HUD was obliged to pursue a formal procurement here then failing to appoint a contracting officer was only one of many FAR violations that the agency committed. *See Institut Pasteur*, 814 F.2d at 627; *Bailey*, 46 Fed. Cl. at 211 ("The concepts surrounding a government solicitation, bid responsiveness, contractor responsibility, and the requirements for noncompetitive procurements do not appear to have played any role in this alleged agreement.").

In cases involving the United States, it is sometimes true that "what is sauce for the goose is not necessarily sauce for the gander." *Universal Film Exchs., Inc. v. United States*, 230 F. Supp. 518, 521 (S.D.N.Y. 1964). But, the court will not follow defendant's lead on what is essentially a wild goose chase. Not even the most liberal view of the law can support the tortured reading of the CDA that defendant offers up here. The administrative exhaustion requirements of that statute are inapplicable here and assist defendant naught in warding off plaintiff's claims. *Per contra*. The court is left with the firm conclusion that jurisdiction over the contract matter *sub judice* lies under the Tucker Act.

## B.     Applicability of 31 U.S.C. § 1501

In arguing that plaintiff's complaint fails to state a claim under RCFC 12(b)(6), defendant makes another remarkable claim – asserting that a statute designed to control internal government budgeting, 31 U.S.C. § 1501(a), precludes the court from enforcing oral contracts under the Tucker Act. That subsection, found in the chapter of Title 31 that describes appropriation accounting, states:

### § 1501. Documentary evidence requirement for Government obligations

(a) An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of –

    (1) a binding agreement between an agency and another person (including an agency) that is –

        (A) in writing, in a way and form, and for a purpose authorized by law; and

        (B) executed before the end of the period of availability for obligation of the appropriation or fund used for specific goods to be delivered, real property to be bought or leased, or work or service to be provided;

    (2) a loan agreement showing the amount and terms of repayment;

    (3) an order required by law to be placed with an agency;

    (4) an order issued under a law authorizing purchases without advertising –

        (A) when necessary because of a public exigency;

        (B) for perishable subsistence supplies; or

        (C) within specific monetary limits;

    (5) a grant or subsidy payable –

        (A) from appropriations made for payment of, or contributions to, amounts required to be paid in specific amounts fixed by law or under formulas prescribed by law;

        (B) under an agreement authorized by law; or

        (C) under plans approved consistent with and authorized by law;

    (6) a liability that may result from pending litigation;

    (7) employment or services of persons or expenses of travel under law;

(8) services provided by public utilities; or

(9) other legal liability of the Government against an available appropriation or fund.

31 U.S.C. § 1501(a).  Subsection (b) of this section advises that "[a] statement of obligations provided to Congress or a committee of Congress by an agency shall include only those amounts that are obligations consistent with subsection (a) of this section."  *Id.* at § 1501(b).

Defendant apparently suffers from tunnel vision in focusing on the first paragraph of section 1501(a) as if it were a stand-alone provision, claiming that it bars the enforcement of express oral contracts.  But, of course, that is not what it says.  It merely indicates that one of the instances in which an amount shall be "recorded as an obligation" is when it is supported by a binding agreement that is "in writing."  It neither explains the legal significance of an "obligation" being "recorded," nor, for that matter, the consequences of failing to do so.  And it certainly does not say that unwritten contracts are unenforceable.

 Defendant, nonetheless, infers the latter conclusion from the statute's use of the word "obligation" – that which does not qualify as an "obligation," it reasons, must be unenforceable. The validity of this syllogism, however, hinges on a number of unstated premises being true, among them, that the term "obligation" has a very particular and limiting meaning – one that is a metaphor for enforceability.  But, there are more than a dozen working definitions of the word "obligation," making it difficult to rely upon any one of them, standing alone, to reveal the statute's intent.  *See General Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595-96 (2004) (noting the difficulty in relying upon unitary meanings when "a word used has several commonly understood meanings among which a speaker can alternate in the course of an ordinary conversation, without being confused or getting confusing.").  Thus, for example, while the term "obligation" is defined as "a legal agreement enforceable by law," it can also mean an "indebtedness or amount of indebtedness."  Dictionary.com (as viewed on November 24, 2008); *see also* The American Heritage Dictionary of the English Language 1212 (4th ed. 2000).  The latter definition actually best correlates with the rest of section 1501(a), which talks of an "amount" being "recorded as an "obligation" – while an "amount" can be "recorded" "as an [indebtedness]," it is hard to fathom how an "amount" can be "recorded" "as an [enforceable agreement]."  That said, it would appear that the meaning of section 1501(a) is not finally derivable from common dictionary definitions.

The word "obligation" is a term of art well known in federal budgeting circles, suggesting that it ought to be interpreted by reference to the subject matter in which it applies.  *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 372 (1986) ("technical terms of art should be interpreted by reference to the trade or industry to which they apply"); *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (same).  The Government Accountability Office (GAO) has supplied the following technical definition of that term –

> A definite commitment that creates a legal liability of the government for the payment of goods and services ordered or received, or a legal duty on the part of the United States that could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States.  Payment may be made immediately or in the future.  An agency incurs an obligation, for example, when it places an order, signs a contract, awards a grant, purchases a service, or takes other actions that require the government to make payments to the public or from one government account to another.  The standards for the proper reporting of obligations are found in section 1501(a) of title 31 of the United States Code. See also OMB Circular No. A-11.

GAO, A Glossary of Terms Used in the Federal Budget Process 70 (Sept. 2005).  This definition hardly treats the concept of an "obligation" as being synonymous with legal enforceability, as it includes within that concept not only agreements that are currently enforceable, but legal duties that "could mature into a legal liability."  And, notably, this definition  refers to section 1501(a) only as defining "the standards for the proper reporting of obligations," further shredding the syllogism that defendant would draw between the definition of an obligation and what should be viewed as enforceable.

Any remaining notion that defendant is correct is dispelled by reading section 1501(a)(1) in context, an approach consistent with the commonsense canon of *noscitur a sociis* – that "a phrase gathers meaning from the words around it."  *General Dynamics Land Sys., Inc.*, 540 U.S. at 596.[11]  Section 1501(a) contains a long list of the types of commitments that can give rise to the record entry of an "obligation" – loan agreements, purchase orders, grants or subsidies, and employment or travel commitments, to name a few.  That the writing requirement in paragraph (1) is merely part of this longer list is telling for several reasons.  First, the potential liability represented by the alleged oral contract here seemingly gives rise to an "obligation" under two other clauses in this litany – either as a "liability that may result from pending litigation" or as some other "legal liability of the Government against an available appropriation or fund." Hence, if, as defendant contends, only commitments qualifying as "obligations" are enforceable, that condition is satisfied here.[12]  More importantly, it would seem odd for Congress to bury an

---

[11]  *See also United States v.* Williams, 128 S. Ct. 1830, 1839 (2008); *Lopez v. Gonzales*, 549 U.S. 47, 56 (2006); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004).  The Supreme Court has oft-noted that "[w]ords that can have more than one meaning are given content by their surroundings."  *Whitman v. Am. Trucking Assn's*, 531 U.S. 457, 466 (2001); *see also Abbott Labs. v. United States*, 84 Fed. Cl. 96, 104-05 (2008).

[12]  In *Kinzley v. United States*, 661 F.2d 187, 190 (Ct. Cl. 1981), the Court of Claims concluded that the predecessor of section 1501 did not bar the enforcement of an employment contract even though it was not contained in a binding written agreement.  Sidestepping the question whether section 1501(a)(1) created a statute of frauds, the court noted that the employment arrangement at issue met the requirements of what is now section 1501(a)(7).  The latter provision, the court observed, does not require, as a precondition to creating an obligation, that an employment contract be evidenced by a binding written agreement in writing, but merely

important statute of frauds within the broad list of commitments qualifying as obligations and then not in a statute focusing on contracting, but rather the proper recording of obligations for budget purposes.  Certainly, Congress knows how to write a statute of frauds, if it wants to – Federal law, indeed, contained such a statute for nearly eighty years, from 1862, *see* Act of June 2, 1862, § 1, 12 Stat. 411, until repealed in 1941, 55 Stat. 743 (1941).[13]  Unlike section 1501(a)(1), that statute of frauds was quite explicit in requiring that every contract made by the Secretaries of War, the Navy and the Interior "be reduced to writing, and signed by the contracting parties."  R.S. § 3744.  Finally, the notion that section 1501(a) does not deal with the enforceability of contracts, but rather with budget accounting is plain not only from that section, but also from the surrounding provisions, all of which deal with budget accounting.[14]  The content and structure of these adjoining provisions, as well as that of section 1501 itself, belies the notion that section 1501(a)(1) is some sort of stealth statute of frauds.

───────────────────

required "evidence of . . . employment or services of persons . . ."  *Id.* at 191.  As an aside, the court noted that the House Conference Report that accompanied the 1954 passage of the statute cast doubt on the notion that even section 1501(a)(1) required a formal contract, noting that the report gave as an example of adequate documentation a letter of intent to enter into a contract.  *Id.* (citing H.R. Conf. Rep. No. 83-2663, at 18).  *Kinzley* suggests that if section 1501(a)(1) is a statute of frauds, it is not a very effective one – of course, the much more likely conclusion is that the statute was never intended to be a statute of frauds to begin with.

[13]  This statute of frauds, which was found for years in the "Public Contract" title of the Revised Statutes (Title XLIII) at R.S. § 3744, was the subject of two Supreme Court cases, as well as several early decisions of the Court of Claims.  *See, e.g.*, *Clark v. United States*, 95 U.S. 539, 541-42 (1877); *Salomon v. United States*, 86 U.S. 17, 19-20 (1873); *Jones v. United States*, 11 Ct. Cl. 733, 740-45 (1875), *aff'd*, 96 U.S. 24 (1877); *Danolds v. United States*, 5 Ct. Cl. 65, 70-71 (1869); *Burchiel v. United States*, 4 Ct. Cl. 549, 551 (1868);  *Lindsley, to Use of Panamore v. United States*, 4 Ct. Cl. 359, 365 (1868).  Ironically, several of these decisions construed the statute in a way that relaxed the writing requirement.  *See, e.g.*, *Salomon*, 86 U.S. at 19-20.

[14]  *See, e.g.* 31 U.S.C. § 1108(c) (requiring the head of an agency to "include with an appropriation request submitted to the President a report that the statement of obligations submitted with the request contains obligations consistent with section 1501 of this title . . . and records showing that the amounts have been obligated"); 31 U.S.C. § 1113(d) (allowing Congress to request budgetary information on "obligations and expenditures"); 31 U.S.C. § 1347(a) (setting forth limits on amounts "otherwise available for obligation"); 31 U.S.C. § 1502(a) (providing rules for limiting an "obligation" to a definite fiscal year); 31 U.S.C. § 1552(a) (barring access to remaining balance "after the period of availability for obligation of a fixed appropriation account ends").  *See also Nat'l Labor Relations Bd. – Improper Obligation of Severable Servs. Contract*, 2006 WL 2673583, at *4 (Comp. Gen. Sept. 14, 2006) ( "The recording statute [Section 1501] contemplates that each agency will record obligations properly and certify to the accuracy of its obligations in its budget submission to the President and Congress.").

The statute's legislative history hammers this point home.  The provision that would become 31 U.S.C. § 1501(a) was enacted by Congress in 1954, as section 1311 of the Supplemental Appropriations Act of 1955, Pub. L. 83-663, 68 Stat. 830.  The accompanying House Report makes clear that this provision was enacted for one purpose, and one purpose only – to provide tighter rules as to when an agency could record an obligation, thereby improving budget reporting to the President and the Congress.  It explained –

> Section 1111.  *Definition of obligations.*– Over a period of years numerous loose practices in handling appropriated funds have grown up in various agencies of the government.  The most difficult problem in this area arises from the recording of various types of transactions as obligations of the government when, in fact, no real obligation exists.  This situation has become so acute as to make it next to impossible for the Committee on Appropriations to determine with any degree of accuracy the amount which has been obligated against outstanding appropriations as a basis for determining future requirements.  It has become necessary to set forth definitively in the law the types of transactions which will be recognized as true obligations and secure accurate reporting thereon in order that it may be possible for the Committee on Appropriations to have a sound basis for its operations.  Section 1111 therefore has been included in the bill to accomplish this purpose.  A clean cut definition of obligations will also greatly simplify the word of the General Accounting Office in auditing and settling the accounts of the various agencies.  The Acting Comptroller General was consulted and has concurred in the proposal as a necessary step to clear up the existing chaotic situation.  The proposal has also been discussed with the Director of the Bureau of the Budget and he agrees that legislation of this type is needed.

H.R. Rep. No. 83-2266, at 49-50 (1954); *see also* H.R. Conf. Rep. No. 83-2663, at 7-8 (1954) (renumbering this provision as section 1311).[15]  Nothing in this legislative history even hints at

---

[15]  In 1961, Congress conducted an extensive review of financial management in the Federal government.  As part of that review, the Staff of the Senate Government Operations Committee prepared a committee print – "A Comprehensive Analysis of Existing and Proposed Legislation Including Financial Management Improvements Made on a Government-Wide Basis," S. Doc. No. 87-11 (Feb. 18, 1961).  This report described the predecessor of section 1501 thusly –

> Section 1311 of the Supplemental Appropriation Act of 1955 resulted from the difficulty encountered by the House Appropriations Committee in obtaining reliable figures on obligations from the executive agencies in connection with the budget review.  It was not uncommon for the committee to receive two or three different sets of figures as of the same date.  This situation, together with rather vague explanations of certain types of obligations particularly in the military department, caused the House Committee on Appropriations to institute studies of agency obligating practices.

the notion that the first of the paragraphs enacted to describe the types of obligations incurred by the government was intended to do double duty – that is, to reinstate in looser terms the very explicit statute of frauds that had been repealed in 1941.  In the court's view, this legislative history confirms what the statute's language, structure and context already firmly establish – that section 1501(a)(1) is a budget provision and not a statute of frauds.  And several cases have so concluded.[16]

Indeed, if defendant is correct that section 1501 obliquely imposes a federal statute of frauds, its argument proves too much, as the statute would sweep aside not only express oral contracts, but also virtually all forms of implied-in-fact contracts.  This would be an anomalous result as the Tucker Act expressly provides for jurisdiction over the latter claims.  28 U.S.C. § 1491(a)(1).[17]  Defendant insists that such implied contracts are unaffected – that its argument only reaches express oral contracts.  But, the Supreme Court long ago defined implied-in-fact agreements as those "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding."  *Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597 (1923); *see also Hercules, Inc.*, 516 U.S. at 423-24; *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1059-60 (Fed. Cir. 2001).  By definition, these types of contracts, which are inferred from conduct, cannot meet the writing requirement of section 1501(a)(1).  Can

---

\*         \*         \*         \*         \*

The result of these examinations lad the foundation for the committee's conclusion that loose practices had grown up in various agencies, particularly in the recording of obligations in situations where no real obligation existed, and that by reason of these practices the Congress did not have reliable information in the form of accurate obligations on which to determine an agency's future requirements.  To correct this situation, the committee, with the cooperation of the General Accounting Office and the Bureau of the budget, developed what has become the statutory criterion by which the validity of an obligation is determined.  This criterion was included as section 1311 in the general provisions of the Supplemental Appropriation Act, 1955 . . . [.]

*Id.* at 85.  The report remarked that "[t]he eight forms of documentary evidence were intended to encompass all types of obligations incurred in the course of Government activities."  *Id.* at 86.

[16]  *See Expired Funds and Interagency Agreements between GovWorks and the Dep't of Def.*, 2007 WL 2120292 at \*6-7 (Com. Gen. July 17, 2007); *Honorable Christopher Bond*, 2003 WL 21361642, at \*4 (Comp. Gen. June 6, 2003); *Kavouras, Inc.*, 1987 WL 102950, at \*5 (Comp. Gen. Oct. 20, 1987); *Fish and Wildlife Serv. – Fiscal Year Chargeable on Ratification of Contract*, 1983 WL 26326, at \*2 (Comp. Gen. Jan. 6, 1983).

[17]  *See, e.g., Hercules, Inc. v. United States*, 516 U.S. 417, 423 (1996); *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1324 (Fed. Cir. 1997).

it really be that what the Tucker Act giveth in terms jurisdiction, section 1501 taketh away in terms of enforceability?  At a minimum, one would require a much more explicit expression of Congressional intent before reaching this odd conclusion.  *See Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 11 (1990) (concluding that to withdraw the Tucker Act remedy a statute must exhibit "unambiguous intention") (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 1013, 1019 (1984)).  And were this construction correct, one would expect to see some mention of this statute in the dozens of decisions that have considered and, at times, awarded damages based upon implied-in-fact contracts or express oral contracts.  *See, e.g., Algonac Mfg. v. United States*, 428 F.2d 1241 (Ct. Cl. 1970); *Thomson v. United States*, 357 F.2d 683, 692 (Ct. Cl. 1966); *Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254, 267 (Ct. Cl. 1965).  There are, in fact, such mentions – but virtually all made in the course of making short shrift of the notion that section 1501(a) renders either implied-in-fact or express oral contracts unenforceable.

An example is *Narva Harris Constr. Corp. v. United States*, 574 F.2d 508 (Ct. Cl. 1978), which defendant, oddly enough, cites in supports of its case.  There, the Court of Claims denied a motion for summary judgment filed by defendant based on the assertion that no contract existed between the parties because the alleged contract had its genesis in oral commitments the contractor received from HUD personnel.  Noting that it had "often allowed recovery on an implied-in-fact contract," *id*. at 511, the court specifically rejected defendant's reliance on the predecessor to section 1501 – 31 U.S.C. § 200 (1976) – holding that:

> The failure, for whatever reason, of an attempt at an express contract, be it written or oral, is not enough, in itself, to deprive a party of a recovery for breach where such additional facts exist for the court to infer the "meeting of the minds" necessary to separate an implied-in-fact from a pure implied-in-law contract.

*Id.* at 511.  While later opinions suggest that portions of the ruling in *Narva Harris* may be *dicta*, *see Philadelphia Suburban Corp. v. United States*, 217 Ct. Cl. 705, 707 (1978), it remains that nearly a dozen decisions have chosen to follow that case in concluding that section 1501(a)(1) neither prohibits express oral nor implied-in-fact contracts.[18]  A number of other cases, among

---

[18]  *See, e.g., Pacord Inc. v. United States*, 139 F.3d 1320, 1322 (9th Cir. 1998);  *Kenney v. United States*, 41 Fed. Cl. 353, 357 (1998) ("Implied-in-fact contracts with the government have been enforced despite statutory or regulatory requirements that contracts be in writing."); *Al-Kurdi v. United States*, 25 Cl. Ct. 599, 602 n.4 (1992) (noting that Federal law does not have a requirement that contracts "must be in writing," and citing the holding in *Narva Harris*); *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 19 (1987) ("Even when a party contracts with the Federal Government, it is not essential that the contract be in written form."); *People's Bank & Trust Co. v. United States*, 11 Cl. Ct. 554, 566 (1987) (same); *South La. Grain Servs., Inc. v. United States*, 1 Cl. Ct. 281, 290 n.7 (1982) ("Defendant does not argue 31 U.S.C. § 200 (1976) . . . as a basis for denial of plaintiff's oral agreement claim, presumably because a like argument was rejected by the Court of Claims in *Narva Harris*."); *Integral Systems, Inc. v. Dep't of Commerce*, 2005 WL 914209 (GSBCA Apr. 14, 2005) ("Section [1501] is intended for internal and bookkeeping and fiscal control purposes.  It does not govern the relationships between the

them several in the Court of Claims, conclude that unwritten contracts are enforceable under the Tucker Act.[19]  All of these cases, of course, are wrong if defendant is right about section 1501(a)(1).  (The opposite, of course, appears to be the case.)  Moreover, *Narva Harris* declined to follow the one case that squarely supports defendant – *United States v. Am. Renaissance Lines, Inc.*, 494 F.2d 1059, 1062 (D.C. Cir. 1974), *cert. denied*, 419 U.S. 1020 (1974) – a case that this court also declines to follow.[20]

---

government and any outside parties with which it deals.”); *see also* Willard L. Boyd III, “Implied-in-Fact Contract: Contractual Recovery Against the Government Without an Express Agreement,” 21 Pub. Con. L.J. 84, 85-87 & n.12 (1991) (“There is no express statute of frauds applicable to government contracts requiring that contracts be in writing, and the clear majority of cases have held that a signed document need no exist in order for a binding contract to exist.”).

[19]  *See*, *e.g.*, *Penn-Ohio Steel Corp. v. United States*, 354 F.2d 254, 267 (Ct. Cl. 1965); *Escote Mfg. Co. v. United States*, 169 F. Supp. 483, 488 (Ct. Cl. 1959); *Ship Constr. & Trading Co. v. United States*, 91 Ct. Cl. 419, 456 (1940), *cert. denied*, 312 U.S. 699 (1941); *People's Bank & Trust Co.*, 11 Ct. Cl. at 566; *ATL, Inc. v. United States*, 4 Cl. Ct. 672, 675 (1984)*, aff'd*, 735 F.2d 1343 (Fed. Cir. 1984); *Pacific Gas & Elec. Co. v. United States*, 3 Cl. Ct. 329, 338-39 (1983), *aff'd*, 738 F.2d 452 (Fed. Cir. 1984); *Harbridge House, Inc.*, 77-2 BCA ¶ 12, 653, at 61,341 (1977); *see also United States v. Purcell Envelope Co*, 249 U.S. 313, 319 (1919) (“It makes no difference that the contract was not formally signed [because] . . . formal execution . . . was not essential to the consummation of the contract.”).

[20]  *American Renaissance* has been roundly criticized as ignoring the text and legislative purpose of section 1501(a).  *See*, *e.g.*, John Cibinic & Robert Nash, Formation of Government Contracts 186 (2d ed. 1986) (“The court's interpretation of the statute is unique and appears to be a misapplication, since the statute's purpose seems to be to provide an effective means of budgetary control . . . .”).  For all the reasons described above, this criticism, with all due respect, seems warranted.  The D.C. Circuit's opinion appears to be based on several other *non sequiturs*.  For example, in concluding that the predecessor to section 1501(a) constituted a statute of frauds, *American Renaissance*, 494 F.2d at 1062-63*,* relied upon the Supreme Court's decision in *Clark, supra*.  The latter case, however, was based upon the explicit statute of frauds that was repealed in 1941.  While the D.C. Circuit suggested that that repealed statute “was similar to the statute here,” 494 F.2d at 1062, even a cursory review of the relevant sections reveals that not to be the case.  *Clark* thus provides no support for the erroneous result reached in *American Renaissance*.

Other cases relied upon by defendant are either inapposite or wrongly decided.  In *Edwards v. United States*, 22 Cl. Ct. 411 (1991), the plaintiff allegedly entered into a binding oral modification of a written contract.  The court noted that defendant had not raised 31 U.S.C. §1501 as a defense and noted that the provision “is contained in a subchapter on appropriations, and therefore it may not be strictly applicable to these circumstances” involving oral contracts. 22 Cl. Ct. at 423.  It held that the oral modification was unenforceable for reasons unrelated to the statute.  *Id*. at 421-22.  In *Presetex, Inc. v. United States*, 3 Cl. Ct. 373, 377 n.5 (1983), this court stated that “[t]o the extent that plaintiff's contract claim is based on an express oral

Accordingly, a proper interpretation of section 1501, well-supported by long-standing precedent, obliges this court to reject defendant's claim that the alleged oral contract was unenforceable.[21]

## III.   CONCLUSION

The court will not paint the lily.   Based on the foregoing, it **DENIES** defendant's motion to dismiss.  On or before January 9, 2009, the parties shall file a joint statute report indicating how discovery in this case should proceed.

**IT IS SO ORDERED**.


s/ Francis M. Allegra
Francis M. Allegra
Judge

_____

contract, it fails on the additional ground that it violated the statutory requirements that an agreement be in writing in order to bind the government."  However, this portion of the opinion, which arguably is *dicta*, contains no critical analysis of this issue beyond citing both *American Renaissance* and *Narva Harris* in support of its conclusion – perhaps unaware that the latter decision contradicts the former.  Finally, defendant asserts that *Essex Electro Engineers, Inc. v. United States*, 2008 WL 782740 at *6 (Fed. Cl. Feb. 20, 2008) "applied 31 U.S.C. § 1501 in the manner we suggest."  That case, however, merely cited the statute in restating the plaintiff's argument in the case and instead was resolved based on the rule that "a consistent prior oral agreement is superseded and overridden by [a] written agreement."  *Essex Electro Engineers*, 2008 WL 782740 at *6 (quoting *Sylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1006 (Ct. Cl. 1972).

[21]   Likewise erroneous is defendant's claim that FAR § 2.101 requires all contracts to be in writing.  Again, defendant is grasping at straws.  As noted above, that provision merely defines what is a "contract" ***for purposes of the FAR*** – and the court has concluded that the oral contract alleged here is neither a contract nor a procurement under the FAR.  None of the cases cited by defendant on this point – most of which deal with the writing requirement for contracts subject to the FAR – convince the court otherwise.  *See, e.g., Harbert/Lummus Agrifuels, Projects v. United States*, 142 F.3d 1429, 1433 (Fed. Cir. 1998); *American General Leasing, Inc. v. United States*, 587 F.2d 54, 56-58 (Ct. Cl. 1978).