# In the United States Court of Federal Claims

No. 07-206C

(Filed:  September 19, 2012)

_____

| | |
|---|---|
| LUBLIN CORPORATION, t/a<br>CENTURY 21 ADVANTAGE GOLD, | *<br>*  Government contract; Trial; Alleged breach<br>*  of confidentiality agreement; Authority to |
| Plaintiff, | *  contract; Breach; Use of circumstantial<br>*  evidence to demonstrate breach; Plaintiff |
| | *  failed to demonstrate that termination of |
| v. | *  subcontract resulted from agency's breach<br>*  of an alleged confidentiality agreement. |
| THE UNITED STATES, | *<br>* |
| Defendant. | *<br>* |

_____

## OPINION

_____

*William F. Thomson, Jr.*, Gilbert & Thomson Law Offices, Fairless, PA, for plaintiff.

*A. Bondurant Eley*, United States Department of Justice, Washington, D.C., with whom was Assistant Attorney General *Tony West*, for defendant.

**ALLEGRA, Judge:**

> *"Even the clearest and most perfect circumstantial evidence . . .*
> *ought to be received with great caution."*[1]

Lublin Corporation, t/a Century 21 Advantage Gold (Lublin or plaintiff), a real estate broker, was a subcontractor on a contract that the Department of Housing and Urban Development (HUD) had with another company.  Lublin alleges that, in the course of a programmatic review of that prime contract, HUD officials agreed to keep Lublin's answers to various questions confidential.  Lublin claims that, despite these assurances, HUD officials leaked its responses to the prime contractor, causing the latter to terminate Lublin.  In making this claim, Lublin relies entirely on circumstantial evidence, emphasizing that it was terminated

_____

[1]  Mark Twain, Pudd'nhead Wilson 123 (1981).

barely two hours after its officials met with HUD.  Following a trial held in Philadelphia, PA, and for the reasons that follow, the court finds plaintiff has failed to meet its burden of demonstrating that any breach of an alleged confidentiality agreement occurred.

## I.    FINDINGS OF FACT

Based upon the record, including the stipulation of facts, the court finds as follows:

Lublin is a Pennsylvania corporation that sells real estate under the name Century 21 Advantage Gold.  It is managed and owned by its Chief Executive Officer, William Lublin, with the assistance of Ronald Rudolph, a realtor and associate broker.

On August 1, 2004, HUD entered into a contract with Hooks Van Holm, Inc. (HVH), a real estate management corporation.  That contract established HVH as HUD's prime contractor for managing, marketing, and overseeing the sale of HUD-owned single family homes in Pennsylvania.  HVH is a Georgia corporation that, at the time of the contract in question, was managed by Chief Executive Officer Linda Van Holm and Vice-President Robert Hooks.

On September 13, 2004, HVH entered into a subcontract with Lublin to provide broad listing broker (BLB) services for HVH in Pennsylvania.  Under the subcontract, plaintiff was to list for sale HUD-owned single family homes (which were managed by HVH) on a local Multiple Listing Service (MLS), and to field inquiries regarding the properties.  Plaintiff received a listing fee of $321 for each property that closed.  The subcontract allowed plaintiff to place its company signs at the properties listed, a valuable right to Lublin not only for promotional purposes, but also because its brokers could earn a separate HUD commission of up to five percent for obtaining a buyer.  The subcontract's initial term ran from September 13, 2004, through October 1, 2005, but could be extended for additional twelve-month periods "at the sole option of Hooks Van Holm, Inc."  The subcontract's termination provision provided:

> Either party may cancel this Agreement with or without cause by giving a 30-day written notice via certified mail to the other party.  At Hook Van Holm, Inc.'s sole discretion, this Agreement may be terminated with 72 hours notice if the Sub-Contractor is not performing to the terms of the Agreement or if changes occur in HUD policies.

In the early part of 2005, HVH learned from other brokers soliciting its business that it could obtain the BLB services that Lublin was providing at a much lower price.  While it believed that Lublin's performance under the subcontract had been adequate, HVH decided to advertise on its website for a new BLB broker for the Pennsylvania region.  Mr. Lublin discovered this on or about February 28, 2005, shortly before Ms. Van Holm called him to discuss renegotiating the subcontract to reduce the listing fee from $321 to $100.  While the parties disagree as to the substance of this conversation, a preponderance of the evidence supports a finding that Mr. Lublin refused to reduce his company's fee.  On March 9, 2005, Mr. Hooks met with Mr. Lublin and Mr. Rudolph.  The parties again differ as to what transpired at

this meeting.  Messrs. Lublin and Rudolph claim that they verbally agreed to reduce their listing fee to the $100 figure requested; Mr. Hooks indicates that the parties did not discuss this topic at all, but rather discussed who should be responsible for paying the City of Philadelphia for use and occupancy certificates.  Again the evidence favors Mr. Hooks on this count.[2]  Following this meeting, Mr. Rudolph sent an email to a number of HVH employees about the certificate issue, prompting Mr. Hooks to ask Mr. Rudolph to refrain from communicating with HVH staff without prior permission.

On March 21, 2005, in an effort to give Mr. Lublin a second chance to accept the lower fee, Mr. Hooks faxed Lublin a new subcontract that provided for a $100 listing fee.  This subcontract made several other significant changes, among them removing plaintiff's signage rights.[3]  Mr. Lublin testified that he does not remember receiving a copy of the new contract, but also testified that if he had, "[i]t would have been signed . . . and faxed back."  Mr. Lublin's testimony, however, is contradicted by an email he sent on March 30, 2005, in which he stated to HVH officials, "[w]e have already faxed you back the March contract."  Despite this statement, plaintiff did not introduce into evidence a signed copy of the new subcontract.  The court finds incredible Mr. Lublin's claim that he *either* never received or, alternatively, received and sent back signed a new subcontract.[4]  It credits instead Mr. Hooks' testimony (supported by several emails) that a subcontract was sent to Mr. Lublin, but never received back.

When Mr. Lublin did not return the new subcontract, Ms. Van Holm decided to investigate how to terminate HVH's contract with Lublin.  On March 24, 2005, Ms. Van Holm sent an email to the company's outside legal counsel (at the law firm of Greenberg Traurig), indicating:

> I need to terminate a contract for a Listing Broker, they had one of the old contracts.  We anticipate problems with them.  How do you suggest we word the

---

[2]   Among other things, plaintiff fails to explain why its officials would have discussed the lowering of the fee at this March 9 meeting if, as Mr. Lublin also testified, he agreed to the reduced fee on February 28, 2005.  This is one of several instances in which plaintiff's claims about subsequent events conflict with its claims about earlier ones.

[3]   The fax cover sheet in the record is not accompanied by the referenced subcontract, but it does refer to an eleven-page attachment.  The record contains a separate copy of the new broker agreement, which was apparently finalized on March 19, 2005, and, indeed, it is eleven pages long.

[4]   Mr. Lublin's credibility on this count is strained further by the fact that the new subcontract would have prevented plaintiff from posting its signs on the properties in question.  In his testimony, Mr. Lublin repeatedly emphasized the importance of this signage and it seems unlikely that, upon receiving the new subcontract, he would have relinquished this important right so readily in immediately signing and shipping the subcontract back to HVH.

termination letter?  [There is] a potential law suit over listing[s] they currently
have and that will be switched over to the new listing broker.

Ms. Van Holm's communication did not identify Lublin as the subcontractor in question.  While
at this time, HVH was still somewhat undecided as to whether to terminate plaintiff, it was
prepared to do so if it did not hear back from Lublin soon regarding the revised subcontract.
Later on March 24, 2005, Mr. Hooks received an email from Michael Hunter of Hunter Realty, a
listing broker who offered to perform the same services being supplied by Lublin.  That same
day, Mr. Hooks responded to Mr. Hunter expressing interest in contracting Hunter Realty and
indicated to Mr. Hunter that HVH's program manager (Kia Williams) would be contacting him.
Another email indicates that Ms. Williams, in fact, contacted Mr. Hunter that same day,
providing him with her contact information.

On the morning of March 25, 2005, HVH's counsel requested a copy of the listing broker
agreement so that she could review the termination provision in the contract.  She also asked for
more details as to why the BLB relationship was being terminated.  That same day, Ms. Van
Holm provided her counsel with a copy of Lublin's subcontract and sent an email in which she
responded:  "[W]e are terminating the agreement because we want to use another firm at a lower
cost.  We offered the opportunity to them to keep the agreement for the same lower price, but
they have not responded."  On March 28, 2005, Mr. Hooks contacted HVH's outside counsel, via
email, asking whether the lawyer had reviewed the subcontractor contract "in regards to the most
appropriate way to terminate?"  The lawyer responded by separately emailing both Mr. Hooks
and Ms. Van Holm (the former at 2:56 pm, the latter at 4:27 pm) indicating that, based on her
reading of the subcontract, HVH could "terminate the contract" either with 72 hours notice or 30
days notice, depending upon the circumstances.[5]  The lawyer indicated that she would "be happy
to draft the termination letter if you'd like."  The next day, March 29, 2005, the attorney
forwarded HVH a proposed letter to effectuate the subcontract termination.  Neither the emails
nor this draft letter specified which subcontract was to be terminated, but at trial, both Mr. Hooks
and Ms. Van Holm convincingly testified that all these documents were referring to HVH's
subcontract with plaintiff.  When it received this draft letter, HVH decided that it would
terminate Lublin and took steps to finalize a contract with Hunter Realty.

Meanwhile, on or about March 20, 2005, Kathleen Roe, a site coordinator at the
Philadelphia HUD office, contacted Mr. Rudolph and asked that Lublin participate in a Quality
Management Review (QMR) program.  The review was designed to identify and correct
problems in HUD's field operations, assessing, *inter alia*, the effectiveness of prime real estate
contractors in implementing HUD's Property Disposition Program.[6]  While Messrs. Lublin and

---

[5]   The record indicates that the same lawyer provided similar information to Ms. Van
Holm via a voicemail.

[6]   A Program Guide in the record described the program in the following terms:

The [QMR] Program is a comprehensive system for evaluating

Rudolph were concerned about participating in the QMR, they eventually agreed to meet with HUD officials at 1:30 pm on March 30, 2005.  In the conversation that led to this appointment, Mr. Lublin asked Ms. Roe for assurances of confidentiality; she responded that any comments made during the QMR process would not be associated with a particular person if mentioned in the final report.

On March 29, 2005, HVH's program manager, Kia Williams, participated in the QMR process on behalf of HVH.  She was interviewed by Dan Rogers, Deputy Director of HUD's Atlanta Home Ownership Center.  Mr. Rogers testified that, although Ms. Williams was concerned with HUD's evaluation of HVH's performance, she did not mention plaintiff during her interview.  As it turns out, prior to the QMR, there had been several complaints from other contractors about HVH, and HUD was considering issuing HVH a letter of concern.

On March 30, 2005, Messrs. Lublin and Rudolph went to HUD's Philadelphia office for the QMR.  When Ms. Roe greeted them, Mr. Lublin again asked for assurances of confidentiality and Ms. Roe reiterated the representation she had made before, to wit, that their names would not be associated with any comments in the final report.[7]  Ms. Roe then introduced plaintiff's officers to Mr. Rogers, who Mr. Lublin claims reassured them at the outset of their conversation that there would be no repercussions or retaliation from anything said during the QMR.[8]  At trial, however, Mr. Rogers insisted that he does not recall any discussion of this sort and had not, to his knowledge, promised any confidentiality.

---

HUD's field operations.  The QMR Program identifies and corrects problems and replicates business and management operations that are exemplary practices within the Department.

QMR evaluations are performed on-site by peers and are based on objective, written standards for successful performance.  In addition to the management assessment of how well an office is administering HUD programs and services, the reviews include a customer perspective and feedback on how employees perceive the office leadership and organization.

[7]  On this point, Ms. Roe testified as follows:

Q.  Did you tell Mr. Lublin that comments he would be making in the QMR would remain confidential?

A.  Only in the sense that it would not be associated with a particular person if mentioned in the final report.

[8]  At trial Mr. Lublin insisted that Mr. Rogers had specifically promised him that there would be no "repercussion and retaliation."  But, this recollection was contradicted by Mr. Lublin's deposition testimony, where he admitted that Mr. Rogers had not used those specific

When Mr. Rogers asked plaintiff's representatives about their subcontract with HVH, they explained that HVH wanted to reduce their listing fee from $321 to $100 per unit because HUD had mandated that HVH be more profitable.  Mr. Rudolph and Mr. Lublin testified that Mr. Rogers became very agitated at this point, and left the room for five minutes, before taking them to see Engram Lloyd, Director of HUD's Philadelphia Home Ownership Center.  Mr. Rudolph and Mr. Lublin testified that after they repeated this information to Mr. Lloyd, he left the room abruptly, saying he would "get to the bottom of this."  Ten or fifteen minutes later, Mr. Lloyd returned and told them that HUD never mandates profitability and that he wanted them to come back in two weeks to discuss this further.

On March 30, 2005, first at 5:30 pm and then again at 6:33 pm, Ms. Van Holm emailed Mr. Messrs. Lublin and Rudolph a copy of a letter in which HVH unilaterally terminated its subcontract with Lublin.[9]  The letter was identical, in all respects, to that previously drafted by HVH's counsel, except that plaintiff's name and other particulars had been inserted in the blanks previously in the draft.  On March 30, 2005, at 10:47 pm, Mr. Lublin responded to the email, stating "[w]e received your letter terminating the October contract" and claiming that  "[w]e have already faxed you back the March contract, and are a little confused as to why this was sent."  In his email, Mr. Lublin requested an opportunity to discuss the termination; that opportunity was never provided.   Although plaintiff claims otherwise, it appears that within a short time, Hunter Realty took over as the new BLB broker for Pennsylvania and began generating home sales.[10]

All the HUD officials who testified at trial unequivocally denied speaking to anyone from HVH about their conversations with Lublin's officials.[11]  Ms. Roe testified that, on the morning

---

words.  Moreover, Mr. Lublin's testimony was also contradicted by that of Mr. Rudolph, who attributed the same words not to Mr. Rogers, but to Mr. Lloyd.

[9]   Although the body of these emails was blank, the email indicated that the subject was "Contract termination" and that an attachment was "Sub-Contractor Agreement Termination Letter Century 21 March 2005.DOC."  The letter attached to the 5:30 pm email was unsigned; that attached to the 6:33 pm email was signed.

[10]   Mr. Hooks testified that it was "totally incorrect" to describe the BLB contract in Pennsylvania as being in "total disarray" after Hunter was substituted for Lublin, further testifying that the only problems that occurred derived from Lublin's failure to cooperate with the transition.  Indeed, HUD records show relatively stable rates of home sale contracts between February 2005 and July 2005, contradicting any claim that any major disruption occurred when HVH "suddenly" terminated Lublin and replaced it with Hunter.

[11]   Typical of this testimony was that of Mr. Lloyd, who testified that "I know that I did not call Robert Hooks either before, during, or after the meeting."  Similarly, when asked if, on March, 30, 2005, they "communicate[d] with HVH . . . in any way," Mr. Rogers and Mrs.

of March 31, 2005, Mr. Rudolph forwarded her the termination email and letter from HVH and that she gave it to Mr. Lloyd.  Mr. Rogers and Mr. Lloyd testified that they both knew HVH had terminated plaintiff's subcontract and that Mr. Lublin was alleging that someone from HUD had leaked his complaints to HVH.  Neither, however, investigated this allegation, viewing the claim of a relationship between the QMR and the termination letter as a matter of "bad timing."  Mr. Lloyd admitted he knew Mr. Hooks because they had worked together a number of years earlier, but he unequivocally denied calling him during or after his March 30 conversation with plaintiff's officers.

Plaintiff filed its complaint on March 29, 2007, and an amended complaint on September 7, 2007.  Plaintiff's amended complaint includes two counts:  (i) breach of an implied-in-fact contract; and (ii) breach of an express contract.  As a result of these alleged breaches, plaintiff claims to have suffered a financial loss of $1,666,085 per year since termination of the subcontract agreement.   On February 16, 2010, defendant filed a motion for summary judgment; that motion was denied on February 24, 2011.  Trial was held in Philadelphia, Pennsylvania from November 2-4, 2011, with post-trial briefing and closing arguments held thereafter.

## II.    DISCUSSION

As for any claim for breach of contract, in order to recover here, plaintiff must establish, *ab initio*, that a valid contract, promising confidentiality, existed between it and the government. *See San Carlos Irr. & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *Health Ins. Plan of Greater N.Y. v. United States*, 62 Fed. Cl. 33, 43 (2004); *Cornejo-Ortega v. United States*, 61 Fed. Cl. 371, 373 (2004).  To establish such a contract, plaintiff must show a mutual intent to contract including an offer, an acceptance, and consideration.  *United Pac. Ins. Co. v. Roche*, 401 F.3d 1362, 1366 (Fed. Cir. 2005); *Trauma Serv. Group. v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997).  In addition, plaintiff must show that the government representative who entered into, or ratified the contract, had the authority to bind the United States to the agreement in question.  *See Flexfab, L.L.C. v. United States*, 424 F.3d 1254, 1262 (Fed. Cir. 2005); *Total Med. Mgmt., Inc. v. United States*, 104 F.3d 1314, 1319 (Fed. Cir. 1997); *Johnson v. United States*, 97 Fed. Cl. 560, 563 (2011).  These requirements apply to express oral contracts of the sort alleged here.  *See Ruttenburg v. United* States, 65 Fed. Cl. 43, 48 (2005); *Cornejo-Ortega*, 61 Fed. Cl. at 373-74; *see also Lublin  Corp. v. United States*, 84 Fed. Cl. 678, 684-90 (2008).

At the outset, defendant argues that no HUD official assured Lublin that the comments its officials made during the QMR would be kept confidential.  Defendant is correct that a preponderance of the evidence does not support a finding that the two most senior HUD officials

_____

Cherlayne Walker, another HUD employee, both unhesitatingly responded, "no."  The testimony of these HUD officials is supported by internal HUD emails sent in May of 2005 discussing claims made by Lublin that HUD officials had caused Lublin's termination by communicating Lublin's comments during the QMR to HVH.

involved here – Messrs. Lloyd and Rogers – promised Lublin's employees any degree of confidentiality.  In arguing otherwise, plaintiff's case is significantly undercut by factual assertions made by Mr. Lublin that appear to be, at the least, inaccurate.[12]  Contrary to defendant's claim, however, one HUD official, Ms. Roe, admitted to making such assurances.  To be sure, Ms. Roe testified that she only agreed that any comments made by Lublin's officials would not be associated with them in any final written report.  But a tenable argument can be made that it was reasonable for Lublin's officials to construe her comments as assuring them that their comments would not, in any attributed way, be communicated by HUD officials to HVH.[13]

Beyond this, defendant argues that plaintiff has failed to show that any of the HUD officials in question, including Ms. Roe, had the express authority to enter into a confidentiality agreement on behalf of the agency.  This is correct.  Neither the various documents in the record that describe the QMR process nor any other HUD regulations or official declarations, so far as the court has seen, suggest that any of the officials in question could commit the agency in this fashion.  Plaintiff does not deny this, but instead argues that the officials in question had the implied actual authority to make the requisite assurances of confidentiality.  *See Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339,1344 (Fed. Cir. 2007) (contrasting the different forms of authority).  The Federal Circuit has held that implied actual authority arises only when it "'is considered to be an integral part of the duties assigned to a Government employee.'"  *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (quoting John Cibinic & Ralph Nash, Formation of Government Contracts 43 (1982)); *see also NASCENT Grp., J.V. ex rel. Native Am. Servs. Corp., Inc. v. United States*, 103 Fed. Cl. 338, 356 (2012).  Plaintiff frames this inquiry in terms of whether HUD officials had the implied actual authority to promise confidentiality as part of the QMR process, urging the court to find that the authority of HUD officials to make such promises was essential to the success of the program.  But, this misstates the issue, as the question here is not whether, generally speaking, maintaining confidentiality would have

_____

[12]  At trial, Mr. Lublin emphasized that the "specific phrase" Mr. Rogers used to reassure him  – "no repercussions or retaliation" – "sticks in my mind."  Yet, about two and a half years earlier, at a point obviously much closer in time to the events described, Mr. Lublin testified at his deposition that he could not "recite to you the specific words" used by Mr. Rogers and that it was only his "impression" that HUD would put things right.  To make matters worse, Mr. Rudolph, who accompanied Mr. Lublin to the same QMR meeting, also had a very specific recollection that a HUD official had promised that there would be no "retaliation," except that he attributed that word not to Mr. Rogers, but to Mr. Lloyd.

[13]  If Ms. Roe's comments gave rise to a contract, an argument can be made that other releases of this information to HVH would violate the implied covenant of good faith and fair dealing.  A breach of that duty can be established by a showing that defendant "specifically designed to reappropriate the benefits [that] the other party expected to obtain from the transaction, thereby abrogating the government's obligations under the contract."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 997 (2011); *see also Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005).

benefitted the QMR process, but rather, more specifically, whether the authority to assure that confidentiality was integral to the duties assigned to Ms. Roe – the only person who the record indicates made such assurances.  To put this differently, the court must determine whether, as part of her responsibilities as a QMR site coordinator, Ms. Roe had the implied actual authority to bind HUD to a confidentiality agreement.[14]

The court seriously doubts whether Ms. Roe had such authority, particularly given her relatively limited role as compared to the more senior HUD officials involved with the QMR process.  Considering the consequences, the court, indeed, is hesitant to imply the authority of any HUD official to make such binding assurances, given not only the absence of any regulations governing this matter, but also the presence of other HUD regulations specifically dealing with confidentiality in other contexts.[15]  But, the court need not resolve this authority issue because plaintiff plainly failed to establish that, assuming *arguendo* any agreement existed, it was breached.  Proof of such a breach, of course, is essential for there to be any recovery here.  *See San Carlos Irr. & Drainage Dist.*, 877 F.2d at 959; *Health Ins. Plan of Greater N.Y.*, 62 Fed. Cl. at 43; *Cornejo-Ortega*, 61 Fed.Cl. at 373.

Defendant emphasizes that there is no direct, first-hand evidence that HUD officials discussed with HVH's officers any of the information relayed to them by plaintiff's representatives.  It points out that all of the individuals who might have been involved in such exchanges, including not only the HUD officials in question, but also HVH's officers, flatly deny having any communication during the relevant period, let alone ones about the views that Lublin

---

[14]  At trial, Ms. Roe testified about her responsibilities, as follows:

Q.     Would it be fair to say that your position with regard to the QMR is site coordinator?

A.     Yes.

Q.     What does a site coordinator do with regard to a QMR?

A.     I gather names from the particular divisions that will have people interviewed.  I send emails to employees asking when are they opening interview.  I set up appointments.  I prepare reports that are submitted to headquarters prior to the QMR to let them know what our particular activities or program issues will be in the QMR area.

[15]  *See, e.g.*, 24 C.F.R. §§ 6.11(a)(2) (dealing with the confidentiality issues in the conduct of investigations involving housing discrimination); 81.45(a) (dealing with confidentiality of information gathered in reviewing violations by lenders of various laws); 81.74(b) (dealing with the protection of mortgage data).

expressed to HUD during the QMR.[16]  Plaintiff has offered nothing to contradict, or even cast doubt upon, these statements – no conflicting testimony, phone records, emails, other documents, etc.  Moreover, as will be discussed in greater detail below, the claims of the HUD and HVH officials are reinforced by convincing evidence demonstrating that HVH's decision to terminate plaintiff predated the QMR meeting and stemmed from a fee dispute that had nothing to do with any communications that allegedly occurred between HUD and HVH.

Plaintiff correctly argues that it need not produce a "smoking gun" in order to prove that HUD officials breached the alleged confidentiality agreement.  But, its proof relies almost exclusively on a single fact – that the termination letter was received a scant two hours after the HUD interviews were completed.  In plaintiff's view, this timing is more than suspicious.  It is, rather, persuasive circumstantial evidence that a communication must have occurred between HUD and HVH during that interval and that that communication led HVH to terminate Lublin immediately.  Plaintiff seeks to reinforce this conclusion with other evidence that it believes demonstrates that HVH made the termination decision hastily, even before it had a plan to replace Lublin as the BLB broker for Pennsylvania.

As this court noted in setting this case down for trial, *see Lublin Corp. v. United States*, 98 Fed. Cl. 53, 59 (2011), a breach of contract may be proven by circumstantial evidence.[17] Circumstantial evidence has been defined as "that which establishes the fact to be proved only through inference based on human experience that a certain circumstance is usually present when another certain circumstance or set of circumstances is present."  *Paulino v. Harrison*, 542 F.3d 692, 700 n.6 (9th Cir. 2008) (quoting *Radomsky v. United States*, 180 F.2d 781, 783 (9th Cir. 1950)); *see also United States v. McIntyre*, 997 F.2d 687, 702 n.16 (10th Cir. 1993); *Byrth v. United States*, 327 F.2d 917, 919-20 (8th Cir. 1964), *cert. denied*, 377 U.S. 931 (1964).  Such evidence "requires an inferential step," *United States v. Ruiz*, 105 F.3d 1492, 1500 (1st Cir. 1997), that is, a factual premise used to reason deductively to a factual conclusion that represents a "preponderance of probabilities according to the common experience of mankind."  *Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 74 (3d Cir. 1996) (quoting *Bornstein v. Metro. Bottling Co.*, 139 A.2d 404, 411 (N.J. 1958)); *see also United States v. Henderson*, 693 F.2d

---

[16]   It is worth noting that, as of the time of trial, HVH no longer had contracts with any agency of the United States, thus significantly diminishing any obvious financial incentive for its officials to misrepresent what occurred here.

[17]   *See Braswell v. Conagra, Inc.*, 936 F.2d 1169, 1176 (11th Cir. 1991); *Williams v. Steuart Motor Co.*, 494 F.2d 1074, 1080 (D.C. Cir. 1974) (breach "may be established by direct or circumstantial evidence or by a combination of the two kinds of evidence"); *Menovcik v. BASF Corp.*, 2010 WL 3518008, at *12 (E.D. Mich. Sept. 8, 2010); *Platner v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 1994903, at *12 (N.D. Okla. May 18, 2010); *Rochester Midland Corp. v. Enerco Corp.*, 2009 WL 1561817, at *16 (W.D. Mich. June 1, 2009); *Preferred Care Partners Holding Corp. v. Humana, Inc.*, 2008 WL 2694750, at *6 n.9 (S.D. Fla. July 8, 2008); *see also Piekarski v. Home Owners Sav. Bank, F.S.B.*, 956 F.2d 1484, 1491 n.7 (8th Cir. 1992).

1028, 1031 (11th Cir. 1982).  This inferential process distinguishes circumstantial evidence from mere speculation – the former yields a preponderant probability, the latter only a mere possibility.  *See Fedorczyk*, 82 F.3d at 74; *see also Dept. of Econ. Dev. v. Arthur Andersen & Co.*, 924 F. Supp. 449, 474 (S.D.N.Y. 1996) ("Circumstantial evidence is evidence that tends to prove a disputed fact whose existence follows inferentially from the existence of evidentiary facts; it is not merely evidence that is as consistent with the fact sought to be proved as with its opposite."); *see generally*, Restatement (Second) of Torts § 433B (1965).

In the case *sub judice*, plaintiff would have this court find that HUD breached the alleged confidentiality agreement because Lublin was terminated by HVH approximately two hours after its meeting with HUD concluded.  But, as is true in other areas of the law, temporal proximity rarely is enough, standing alone, to give rise to an inference that one event caused another.[18] That is especially true here because, viewed in the context of the remainder of the record, the timing of the termination actually is not suspicious, but rather represents a coincidence.

The record demonstrates that HVH initiated the process to terminate Lublin on or about March 24, 2005, six days before the QMR meeting.  This is documented by a series of emails in the record.  The first of these is on March 24, 2005, in which HVH sought advice from its attorney regarding the best way to terminate one of its listing brokers.  Although Lublin is not named in any of these communications, there is little doubt that it was the subject of these communications.  Thus, for example, a March 25, 2005, email from HVH to its attorney indicates that "we are terminating the agreement because we want to use another firm at a lower cost," adding that "[w]e offered the opportunity to them to keep the agreement for the same lower price, but they have not responded."  Despite plaintiff's contrary claims, HVH found itself in precisely this situation with respect to Lublin.  On this count, the court rejects Mr. Lublin's testimony that he had agreed to lower his fee and had signed and faxed back to HVH the subcontract effectuating that change.  Moreover, it is notable that, except for the addition of some particulars (*e.g.*, Lublin's name), the termination letter sent to Lublin on March 30, 2005, was identical to the draft letter that HVH's attorneys sent it on March 29, 2005.  All these facts leave the court with the firm conviction that Lublin's termination was a foregone conclusion days before any supposed communications occurred between HVH and HUD on March 30, 2005.

To buttress its timing argument, plaintiff makes several other factual claims.  But, the inaccuracy of the latter claims has the opposite of the effect plaintiff intended, serving only to

---

[18] For example, in employment discrimination cases, it has often been said that the "suspicious timing" of an employment action, standing alone, is inadequate to prove animus or discrimination.  *See Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 675 (8th Cir. 2006); *Turner v. Gonzales*, 421 F.3d 688, 696-97 (8th Cir. 2005); *Stone v. City of Indianapolis Pub. Util. Div.*, 281 F.3d 640, 644 (7th Cir. 2002); *see also Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) ("The mere fact that one event preceded another does nothing to prove that the first event caused the second.").

undercut its basic position.  Plaintiff's primary assertion in this regard is that HVH made its termination decision in haste, angered by the comments made by Lublin to HUD.  The email trail in this case thoroughly contradicts this assertion, indicating that HVH had a plan for terminating its relationship with Lublin which it executed when Lublin failed to lower its fees.  Those messages reflect that the timing of the termination had nothing to do with HUD communicating with HVH, but rather was driven by HVH's desire to terminate its subcontract with Lublin before the end of March.  Plaintiff errs in suggesting that the "sudden" termination created turmoil in the Pennsylvanian HUD housing market, because HVH had failed to hire a broker to replace Lublin.  In fact, HVH had hired such a substitute (Hunter Realty) at about the same time it finally decided to terminate Lublin.  And it appears that Hunter Realty began work upon the termination, its transition hindered only by Lublin's failure to cooperate in several regards.  Indeed, as noted previously, the record reflects that HUD sales occurred in the succeeding months as might be expected.  Nothing about this course of events suggests that HVH acted in haste, without due preparation, angered by information that it had received less than two hours before the termination letter was sent.

Without any other support in the record, plaintiff's views regarding the timing of its termination amount to nothing more than conjecture, speculation and surmise – raising only a possibility that something may have happened.  But that is not enough – not by a longshot.  Put another way, plaintiff's evidence fails to give rise to a preponderant probability that a conversation between HUD officials and HVH officials occurred during the interval in question, so as to breach a confidentiality agreement that allegedly existed between HUD and Lublin.  Plaintiff, therefore, has failed to bear its burden of proof on an essential element of its case.[19]

## III.   CONCLUSION

Plaintiff attempts to pile a Pelion of conjecture upon an Ossa of speculation in relying on a single, lonesome fact – the timing of its termination – to prove that HUD officials breached an alleged confidentiality agreement.  But like the Greeks of old, whose stone pile atop Mt. Olympus failed to reach the heavens, plaintiff's efforts fall far short of its goal, dashed, *inter alia*, by evidence proving that HVH's decision to terminate Lublin predated Lublin's meeting with HUD.

---

[19]   Of course, even if plaintiff had established that a contract existed here and that it was breached, it still had to show, in terms of causation, that "the damages would not have occurred but for the breach."  *Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed. Cir. 2008); *see also Cal. Fed. Bank v. United States*, 395 F.3d 1263, 1267 (Fed. Cir. 2005); *Spectrum Scis. and Software, Inc. v. United States*, 98 Fed. Cl. 8, 14 (2011).  The latter hardly seems the case here, as the record supports the view that plaintiff's termination was inevitable, based on its refusal to reduce its fees to what the market would charge.  Certainly, plaintiff has not remotely shown that if its other critical factual assertions are true (*e.g.*, there was a communication between HUD and HVH that accelerated its termination), it would have continued in its job for the full term of its contract and thereby avoided the $1.6 million in damages that it claims.

The court finds that plaintiff has not proven that any contract it supposedly had with HUD was breached.  That failure of proof is fatal to plaintiff's case, which must be dismissed. The Clerk is hereby ordered to dismiss plaintiff's complaint.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge